**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

COALITION TO MARCH ON THE RNC,

               Plaintiff,

v.                                                     Case No. 24-CV-704

CITY OF MILWAUKEE,
CAVALIER JOHNSON in his official capacity
as Mayor of the City of Milwaukee, and
JERREL KRUSCHKE in his official capacity as
Commissioner of Public Works for the City of Milwaukee,

               Defendants.

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

In less than a month, national and international attention will turn to the City of Milwaukee as host of the 2024 Republican National Convention (hereinafter "RNC"). The City has worked diligently for nearly two years planning for public safety, protection of free expression, and myriad other logistical concerns connected with this event. Because the RNC is a designated National Special Security Event, the United States Secret Service is the lead security planning agency supported by numerous other federal, state, and local agencies and units of government. As has been true in other convention cities and other convention litigation, the host City may not take certain actions or release certain information until the Secret Service makes public the security perimeters for the event.

Prior to the perimeters being finalized and announced, and despite the City directly conferring with Plaintiff including on the day suit was filed, Plaintiff seeks to strike down as

unconstitutional portions of the City of Milwaukee's Extraordinary Event Ordinance passed in anticipation of the RNC, to prohibit the named Defendants from enforcing the Ordinance, and to enjoin the City to act on what were then-pending applications to parade and protest during RNC.

The Defendants take very seriously the protection of both the public's rights to free expression and public safety. The City's Ordinance is constitutional, both on its face and as applied. Plaintiff and others have ample opportunities to engage in expressive activities during the RNC. That they are not the opportunities of Plaintiff's specific design or desire – which include parading directly beneath one of the RNC venues, as well as down a City street used for delegate bus transportation, both of which are within the Secret Service-determined areas in which a blast could cause catastrophic damage – does not entitle Plaintiff to the extraordinary relief sought in this action.

Since Plaintiff's filing of this action, the rapidly evolving factual landscape, including today's announcement of security perimeters by the Secret Service, likely moots much of Plaintiff's argument and requested relief. Regardless, Plaintiff cannot demonstrate a likelihood of success on the merits of a challenge to the Ordinance either on its face or as applied. Further, the factual record developed to date, including Plaintiff's own statements, show that the balance of the equities and the public interest both strongly favor denying the requested preliminary injunction.

Defendants respectfully request that the Court do just that.

## FACTUAL BACKGROUND

### A.    General Background

The 2024 RNC will be held at the Fiserv Forum ("Fiserv") and other venues in downtown Milwaukee from July 15-18. (Gibson Cucchino Decl. ¶ 4). The Baird Center, UW-

Milwaukee Panther Arena, Miller High Life Theatre, and the Milwaukee County Historical Society (collectively, with Fiserv Forum, the "Convention Venues") will also host convention events. *Id.* It is estimated that more than 50,000 delegates, staff, visitors, press and law enforcement personnel will come to Milwaukee for the RNC. *Id.* at ¶ 5. Political leaders of regional, national, and world stature, including Secret Service protectees, will attend the RNC. *Id.*

The Convention Venues are located in Downtown Milwaukee and adjacent to a significant portion of Milwaukee's high density commercial and residential areas.[1] *See* Gibson Cicchino Decl. ¶¶ 26-28. Interstates 94, 794, and 43 interchange less than two thousand feet northwest of Fiserv.[2] These critical points of ingress and egress are accessed by hundreds of thousands of vehicles—nearly half of the entire state's commerce and tourism traffic—each day.[3]

The Secret Service is charged with planning, coordinating and implementing security operations at special events of national significance. (Gibson Cucchino Decl. ¶ 8). The RNC is one such event. (Gibson Cucchino Decl. ¶ 9). In addition, the Secret Service is charged with protecting former Presidents and their spouses, as well as major Presidential and Vice-Presidential candidates. (Gibson Cucchino Decl. ¶ 7). Federal law prohibits persons or groups

---

[1] *See* https://www.city-data.com/neighborhood/Downtown-Milwaukee-WI.html (Downtown Milwaukee comprises an area of 1.084 square miles, and has a population density of 11,971 people per square mile—in contrast to 5,864 people per square mile in Milwaukee, generally); https://biztimes.com/report-says-downtown-milwaukees-density-ranks-high-compared-to-other-cities/ (News article entitled "Report says downtown Milwaukee's density ranks high compared to other cities," and stating, "Downtown Milwaukee is one of the most dense central business districts of major cities in the United States, according to a new report from Commercial Cafe that studied available land in the downtowns of 25 cities.")

[2] *See* https://www.google.com/maps/@43.0444232,-87.9210632,16.5z?entry=ttu (last accessed 6/18/2024).

[3] *See* https://www.hntb.com/projects/marquette-interchange/ (last accessed 6/12/24).

3

from entering a restricted area where a Secret Service protectee is or will be visiting. *Id*.; *see also* 18 U.S.C. § 1752.

### B.  Security and Operations Plan for 2024 RNC

The Committee on Arrangements ("COA") decides what convention events will occur, and when and where. (Gibson Cucchino Decl. ¶ 14). The Mayor and other City officials, whose responsibilities include protecting the interests of the tens of thousands of people who live and work in Downtown Milwaukee and will be affected by the RNC, make many decisions concerning traffic flow and use of the streets and parks. *Id*. The Committee's plans for the convention, and the City's plans for hosting it, are the starting point for the security plan. The Secret Service is charged with devising security strategies that will permit these plans to be implemented safely. *Id*.

The Secret Service is the lead federal agency responsible for designing, planning and implementing security measures at the RNC along with other interested state, federal, and local agencies. (Gibson Cucchino Decl. ¶ 9, 12).  Security planning for the RNC was informed by the expertise of law enforcement professionals, as well as experts in public health and safety, emergency response, disaster response, traffic flow, and other fields. (Gibson Cucchino Decl. ¶ 12). The Secret Service considered a wide range of potential security threats, including terrorist attacks, lone gunmen, fire, environmental hazards, chemical or biological attacks, structural safety concerns, vehicle attacks, and suicide bombers – and adopted strategies to prevent attacks, and for emergency response if they do occur. (Gibson Cucchino Decl. ¶ 11). Planners must balance security needs with citizen's First Amendment rights; public safety; the needs of residents and businesses in the vicinity; traffic flow and transportation needs for all those who

4

live or work in Milwaukee; and ongoing law enforcement needs unrelated to the convention. (Gibson Cucchino Decl. ¶ 15).

A critical aspect of security planning for the Convention Venues concerns vehicle and pedestrian access to the buildings and the immediate vicinity. (Gibson Cucchino Decl. ¶ 16). Areas around the venues will be closed to both vehicles and pedestrians – except delegates and others who are working or participating in the event, who have passed through a magnetometer or similar screening. *Id.* This closed area, referred to as the "pedestrian restricted perimeter" or "secure perimeter," is delineated by non-opaque security fencing and other barriers. *Id.*

One must have credentials or an event ticket to enter the secure perimeter surrounding the Convention venues. (Gibson Cucchino Decl. ¶ 16). Entry into the secure perimeter is possible only at designated access points. (Gibson Cucchino Decl. ¶ 17). The contours of the secure perimeter are based on technical assessments and evaluations completed by the Secret Service. (Gibson Cucchino Decl. ¶ 19). The Secret Service considers potential risks including person-borne explosives, the physical features and elevations of the buildings to be secured, the effective range of weapons, and emergency ingress and egress routes in establishing the secure perimeter or pedestrian restricted perimeter. *Id.* The urban setting of the Convention Venues further complicates this plan. *Id.*

Drivers must pass through a vehicle screening point to access certain areas around the secure perimeter by vehicle (the "vehicle screening zone"). (Gibson Cucchino Decl. ¶ 20). The vehicle screening zone surrounds the pedestrian restricted perimeter and encompasses a larger area than the secure perimeter. *Id.* Pedestrians may freely access this zone without screening. *Id.* Drivers may access this zone without a credential or event ticket, provided they pass through a vehicle screening point. *Id.* Vehicle screening points will be located so as to enable traffic to

5

access the secure perimeter areas from multiple directions, but planners anticipate cars will line up to wait because the screening process takes several minutes to complete. (Gibson Cucchino Decl. ¶ 21). The boundaries of the vehicle screening zone were established based on technical security assessments related to vehicle-borne threats. (Gibson Cucchino Decl. ¶ 22).

### C. Transportation Plans

More than 110 hotels will house the six to eight thousand delegates expected to attend events at the Convention Venues, and other locations in Milwaukee. (Gibson Cucchino Decl. ¶ 6). The Secret Service must ensure that delegates and those working the RNC are able to safely enter and exit the secure perimeter 24 hours a day, in both planned and emergency situations. (Gibson Cucchino Decl. ¶ 24). Delegates will be transported to the Convention Venues by a large number of secure buses. (Gibson Cucchino Decl. ¶ 18). Two gravel lots north of Fiserv, between Juneau Avenue and McKinley Avenue, will serve as the bus depot during the RNC. *Id*. Because buses will arrive from the west on Fond du Lac Avenue and from the east on Knapp Street, the security perimeter encompasses Fond du Lac, McKinley, and Knapp to ensure that buses may move safely in and out of the secure perimeter. (Gibson Cucchino Decl. ¶ 24).

Delegates arriving by bus will disembark and proceed south toward screening locations on Juneau Avenue before proceeding toward Convention Venues. (Gibson Cucchino Decl. ¶ 17). Attendees may instead opt to approach on foot, taxi, or rideshare from their hotels or other locations in the city. (Gibson Cucchino Decl. ¶¶ 6, 17). For that reason, credentialed or ticketed individuals will be able to enter the secure perimeter on foot at designated access points. (Gibson Cucchino Decl. ¶ 17).

The Secret Service and MPD also must ensure that there are sufficient, well-placed routes for emergency responders to access both the secure perimeter and the areas around it. (Gibson

Cucchino Decl. ¶ 25; Gauerke Decl. ¶ 11). In order to ensure safe emergency response routes to and from Convention Venues from the east State Street, Kilbourn Avenue, and Wells Street must remain free of pedestrian traffic. (Gibson Cucchino Decl. ¶ 26; *see also* Gauerke Decl. ¶ 12). The security plan calls for emergency response vehicles to cross the Milwaukee River via State Street, Kilbourn Avenue, and Wells Street. (Gibson Cucchino Decl. ¶ 27; Gauerke Decl. ¶ 12). This staging is essential in order to expeditiously access areas of concentrated commercial activity, like bars, restaurants and hotels east of the Convention Venues. (Gauerke Decl. ¶ 12). Emergency vehicles must cross Dr. Martin Luther King Jr. Drive ("MLK Drive") to access the secure perimeter from the east. (Gibson Cucchino Decl. ¶ 27; Gauerke Decl. ¶ 12). Particularly between State Street and Highland Street, MLK Drive is densely populated with bars and restaurants, and space for emergency vehicles is already limited. (Gibson Cucchino Decl. ¶ 28; Gauerke Decl. ¶ 12).

The Milwaukee Police Department ("MPD") has worked closely with the Secret Service to develop the RNC security plan over many months. (Gauerke Decl. ¶¶ 4-6). MPD has taken extraordinary measures to maintain public security and to facilitate the needs of all who live, work, or travel in the City, and to ensure that residents and visitors alike have access to their homes and businesses. (Gauerke Decl. ¶¶ 8-9). MPD will also temporarily supplement its force with substantial additional licensed officers from numerous other state and local law enforcement agencies. (Gauerke Decl. ¶¶ 9-10). The City has or will execute separate contracts with approximately 80 political subdivisions within the state, and has or will contract with the State for other states' law enforcement personnel and for National Guard service members. (Gauerke Decl. ¶ 10).

7

The logistical aspects of implementing a transportation allowing for the safe and orderly flow of traffic, and to ensure the arrival and departure of delegates to and from an event of this size are extraordinary. (Gauerke Decl. ¶ 13). Changes to the plan at this stage would have ripple effects on many other interrelated decisions and considerations. (Gauerke Decl. ¶ 14). Each major event related to the RNC involves logistical issues concerning transportation, traffic flow, and public safety, which may impact other decisions about appropriate security for the event, for other events, and the City as a whole. (Gauerke Decl. ¶ 14). In addition, the law enforcement community is actively working to detect plans to attack or otherwise disrupt the RNC and must maintain flexibility to alter security strategies as necessary based on intelligence. (Gauerke Decl. ¶ 15).

The Secret Service and City officials publicly announced the RNC security plan for the first time at a press conference earlier today, Friday, June 21, 2024. (DeSiato Decl. ¶ 12). The Convention Venues are located within an area one to two city blocks wide and five blocks tall, bounded by Juneau Avenue on the north and Wisconsin Avenue on the south. (Kruschke Decl. ¶ 11, Ex. 5). Fiserv is sited south of Juneau Avenue and east of 6th Street. Miller High Life Theatre and Panther Arena lie one block south of Fiserv, between State Street and Kilbourn Avenue. The Milwaukee County Historical Society is one block due east of Panther Arena. The Baird Center sits another block further south of Panther Arena and the theatre. Thus, the Convention site is oriented from north-to-south, with its major points of ingress and egress located upon cross-street running east-and-west particularly along its eastern perimeter, excepting highway access which lies to the west via McKinley Avenue.

The secure perimeter north of Fiserv will be delineated by a semi-transparent fence line along the north side of McKinley Avenue from MLK Drive to Fond du Lac Avenue (a/k/a

Highway 145). (Gibson Cucchino Decl. ¶ 16, 24). The southern perimeter border mostly falls along Wisconsin Avenue. (Kruschke Decl. ¶ 11, Ex. 5). The Milwaukee River flows north-to-south to the east of Fiserv, heading east away from the convention sites between the State Street bridge and the Wisconsin Avenue bridge. The river serves as a natural eastern boundary near the top of the Convention site; a physical barrier will delineate the eastern hard perimeter below State Street. (Kruschke Decl. ¶ 11, Ex. 5).

### D. Public Viewing Areas

Earlier today, the City announced plans to provide two speakers podiums with adjacent public viewing areas for listeners and demonstrators, as well as an official parade route. (DeSiato Decl. ¶ 12; Kruschke Decl. ¶ 11, Ex. 5). For convenience, these areas can be described as the North Public Viewing Area and the South Public Viewing Area.

The North Public Viewing Area abuts the secure perimeter on the north side of McKinley Avenue. (DeSiato Decl. ¶ 13). A speaker's platform will face west on MLK Drive, approximately 150 feet diagonal across McKinley from the eastern delegate bus lot. *Id.* The southwest corner of the North Public Viewing Area at Vel R. Phillips Avenue is approximately 100 feet from the western delegate bus lot, and around 550 feet from the Deer District/Fiserv Forum entrances. *Id.*

The City will restrict vehicle traffic of Vliet Street on MLK Drive and Vel R. Phillips Avenue to the hard perimeter fence-line. *Id.* As such, demonstrators, protesters, and curious members of the public will be able to walk freely along the sidewalk on the north side of McKinley Avenue and to congregate on the portions of those streets south of Vliet Street. *See id.* Delegates arriving by bus will queue for screening on Juneau Avenue before proceeding to the Convention Venues. (Gibson Cucchino Decl. ¶ 17). The North Public Viewing Area features

9

direct sight lines to Fiserv, access to delegates as they load onto and disembark from buses, as well as an elevated platform and City-provided amplification for speakers. (DeSiato Decl. ¶ 13).

The South Public Viewing Area encompasses the parade route, along with a second speaker's podium within Zeidler Union Square Park ("Zeidler"). (DeSiato Decl. ¶ 14). Zeidler park is bounded by Michigan Street on the north, MLK Drive on the east, Everett Street to the south, and Vel R. Phillips to the west. *Id.* The park lies one block south and one block east of the Baird Center, the media filing center and a host venue for RNC-related events. *Id.*

The City has obtained a permit to use Zeidler park from Milwaukee County as part of the South Public Viewing Area. (DeSiato Decl. ¶ 15). Two other parks located near or within the vehicle screening zone, Pere Marquette and Red Arrow, are also county property. *Id.*

The Official Parade Route announced this morning begins on the east side of Zeidler park. (DeSiato Decl. ¶ 16). Parades will proceed east on Michigan Street, north on 2nd Street, east on Wisconsin to the intersection with Plankinton Avenue, then south to Clybourn Street, west to 5th Street and then north on 5th Street to an area adjacent to Vel. R. Phillips Plaza, and concluding on the western half of the park. *Id.*

Following the announcements this morning, the City emailed individuals and/or groups that previously applied for speaker's platform or parade registrations inviting them to express their preference between the North or South Speaker's Platform before noon on Wednesday, June 26. (DeSiato Decl. ¶ 17, Ex. 3). Applicants were additionally asked to notify the City which speaker's platform they would prefer, and/or if they were withdrawing their application for either a speaking or parade time slot. *Id.* The City will inform applicants of their assigned date/start time for use of the Official Parade Route and North or South speakers platform beginning at 5 p.m. on June 26, and no later than July 1, 2024. (DeSiato Decl. ¶ 17). In addition, the

Commissioner of the City of Milwaukee's Department of Public Works has announced standards for applying Section 9-a-2 of the Extraordinary Event Ordinance (the "Ordinance"). (Kruschke Decl. ¶ 12). The application portal and City's FAQ's have also been updated. (Kruschke Decl. ¶ 12, Exs. 6 and 7). Extensive information about the impact of these announcements, including street closures, are contained in the City's FAQs. (DeSiato Decl. ¶ 17, Ex. 4).

###### E. Plaintiff's Permit Applications

Plaintiff first filed three applications under the City's Special Event Permit ordinance, MCO § 105-55.5. (ECF No. 3-1, ¶¶ 9-13, 12; Kruschke Decl. ¶¶ 7-10). These applications have some aspects in common. They all sought to use the same, or a similar, route (the one indicated in the ACLU's letter to Mayor Johnson on May 5, 2024) using Red Arrow Park as the starting point for their parade and continuing south on Water Street to Wisconsin Avenue, heading west on Wisconsin to Vel R. Phillips Avenue, then north on Vel R. Phillips to Wells, then west on Wells to 6th Street, then north on 6th to Juneau Avenue, then proceeding east on Juneau to Water and heading south to Red Arrow Park.[4] *Id..* All of the applications indicated that approximately 500 to 1,000 people would participate in the parade. *Id..* Each application varied as to the time sought to conduct the parade, but all of them requested at least 12 hours of right-of-way access (generally between the hours of 9 a.m. and 11 p.m.) on July 15, 2024. *Id.*

Specifically, on April 12, 2023, Adelana Akindes filed an application on behalf of Plaintiff. (Kruschke Decl. ¶ 8, Ex. 2). This application was denied in an e-mail to Akindes on that same date, indicating the such applications cannot be accepted more than 6 months prior to the event date. (ECF No. 3-7, p. 1-2).

---

[4] The 9/21/23 application sought a route that would approximately halve the apparently preferred route, proceeding down Water to State, west to 6th, and then back to Red Arrow Park. (Kruschke Decl. ¶ 9, Ex. 3).

The City next received an application on September 21, 2023. (Kruschke Decl. ¶ 9, Ex. 3). This application was deficient, because it did not indicate an "authorized representative" with contact information as required under MCO 105-55.5-2-b-1 and was not processed. *Id*.

Plaintiff filed another application on January 19, 2024. (Kruschke Decl. ¶ 10, Ex. 4). The City sent an e-mail to the address indicated on the application, stating: "Your Special Event Permit Application has been successfully submitted. If you have any questions, please contact the Special Event Permit Office at (414) 286-3915." *Id*.

On February 13, 2024, Assistant City Attorney Kathryn Z. Block reached out to the Plaintiff's attorney, Timothy Muth, to discuss this last-in-time application. (Block Decl. ¶¶ 6-11). During a phone call on that date, Block explained to Atty. Muth that the City was contemplating the Ordinance (subsequently passed in March[5]) which would regulate special events within the security perimeters established by the Secret Service, (including the Plaintiff's proposed parade route). (Block Decl. ¶ 7). Attorney Muth indicated an interest on the part of the Plaintiff to participate in meetings to be hosted by the City's Office of Community Wellness and Safety regarding the ordinance and Block forwarded a draft of the Ordinance on March 13. (Block Decl. ¶¶ 8, 12).

The Ordinance generally stated that upon its effective date, City Officials were to discontinue accepting applications for events taking place within the "preliminary security footprint"[6] under MCO 105-55.5 during the "convention period."[7] (§ 1-d). The City then

---

[5] The Extraordinary Event ordinance passed the full Common Council on March 19, 2024 and was published on April 6, 2024, the "effective date" for significant portions of the ordinance. (ECF No. 7-6, p. 1-5).

[6] The ordinance defined "preliminary security footprint" as an area indicated on an included map, bounded roughly by Water Street on the east, Clybourn Street on the south, 9th Street on the West, and Cherry Street on the north – of necessity, a larger area than the then undefined vehicle screening zone. (§ 2-k). Note that the Ordinance employs different terms than the Secret Service when discussing the other relevant security perimeters, but that "security footprint," as used in the Ordinance, means the same thing as the secure perimeter, and "credentialed zone" the same as vehicle screening zone. (§§ 2-e and n).

established an online portal to accept applications under the Ordinance, (accessible both from the portal where the City accepts permit applications under 105-55.5 and the City's RNC website). (Kruschke Decl. ¶ 11). Under the Ordinance, the City sought to provide two opportunities that would not be otherwise available to persons wishing to use the public ways: (1) provide an "official parade route" within the "preliminary security footprint as close as reasonably practicable to sight and sound distance from the entrance of the convention facilities" for use of applicants and (2) provide an "official speaker's platform," also inside the preliminary security footprint, "in a designated county park or parks or in an alternative location." (§§ 2-g and h). The "official parade route" would allow an applicant the exclusive use of the route to travel on the City's public ways, unimpeded by vehicular traffic or other pedestrians, which the City would restrict for the length of the route.[8] (§ 4-a). The "official speaker's platform" provided an applicant the use of a raised platform and sound amplification equipment for the communication of a message for a set time. (*Id.*)

After the Ordinance passed, Muth and Block continued to communicate on matters pertaining to the ordinance. Block assured Muth the City intended to treat Plaintiff's January 19 application as a "hold" on their place in line for purposes of assigning parade slots on the "first-come, first-served" basis identified in the Ordinance, but that the City expected that Plaintiff would follow-up with a formal application under the Ordinance (as the requirements of the Ordinance did not align perfectly with MCO 105-55.5). (Block Decl. ¶ 16). Block also provided

---

[7] "Convention period," for purposes of the Ordinance was defined to commence at 12:01 a.m. on July 13 through 12:01 a.m. on July 20. (§ 2-d).

[8] The Ordinance further restricted other "parades," defined as: "any formation, march, or procession of any kind traveling in unison for a common purpose upon the streets, excluding sidewalks, within the city that interferes with the normal flow or regulation of vehicular or pedestrian traffic upon the streets within the city." (§ 2-i).

advice to Muth as to how Plaintiff could coordinate applications for use of the podia contemplated under the Ordinance.  (Block Decl. ¶ 19).

Plaintiff did, in fact, submit an application under the Extraordinary Event ordinance on April 17, 2024.  This application expressed a desire to conduct a parade (as opposed to use the podia or to do both), a preference for a 11 a.m. to 3 p.m. timeslot (from the options of 11 a.m. to 3 p.m., or 3 p.m. to 7 p.m.) on July 15, 2024.  (DeSiato Decl. ¶ 11, Ex. 1).  On that same date, Block received an e-mail from Muth, noting several concerns about the Ordinance, including: a lack of awareness about the particular route; their right to object to any future changes the City reserves the right to make under the Ordinance; and their claimed reservation of right to conduct a "rally in conjunction with the march within, or outside of, the security footprint."  (Block Decl. ¶ 17, ECF No. 6-7).

Block and Muth then arranged a virtual meeting to discuss any of Plaintiff's concerns on April 25, 2024.  (Block Decl. ¶ 18).  At that meeting, and in a subsequent phone call on May 2, Block again provided advice on how Plaintiff could coordinate use of the official speaker's platform; discussed the fact that the official parade route would not be announced until several weeks prior to the RNC; and Atty. Muth's concerns that merely walking or protesting within the "security footprint" could lead to citations or arrest.  (Block Decl. ¶¶ 18-19).  On this later point, Block noted that any prohibition on the conduct of a "parade" within the ordinance was tied to the violation of other ordinances regarding impeding vehicular and pedestrian traffic flow as well as MPD's prior experience balancing of pedestrian/vehicular interests in connection with previous protests conducted in close quarters (including around clinics that provide abortion services).  (Block Decl. ¶ 19).

Block and Muth had one additional conversation regarding these matters: The day this suit was filed on June 5, 2024. (Block Decl. ¶ 22). Block had reached out to Muth in an attempt to address any concerns associated with Muth's May 30, 2024 letter to Defendants. (*Id.*) Block stated that the parade route and podia location/s were yet to be announced, but that an announcement could be expected along the lines of the timing previously addressed (two to four weeks prior to the RNC). (*Id.*) In light of all of their other communications, Block enquired whether the May 30 letter should be viewed as an attempt to counter public communications from the RNC.[9] (*Id.*) Muth assured Block that was the case, and that the City was invited to publicly share the ACLU's letter. (*Id.*)

## ARGUMENT

### I. Standard of Review

A mandatory preliminary injunction is an injunction requiring an affirmative act by the defendant. *See Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). Because a mandatory injunction requires the court to command the defendant to take a particular action, requests for mandatory preliminary injunction are "ordinarily cautiously viewed." *Id.* (quoting *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1978)). "Mandatory injunctions are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds." *W. A. Mack, Inc. v. Gen. Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958) (quoting *O'Malley v. Chrysler Corp.*, 160 F.2d 35, 36 (7th Cir. 1947)).

A plaintiff seeking a preliminary injunction must establish: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest.

---

[9] In fact, on May 3, Muth asked Block for a copy of the RNC's April 26, 2024 letter to the Secret Service, which she subsequently obtained and provided as a courtesy. (Block Decl. ¶ 20).

15

*Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008) (citations omitted).

## II.     The Coalition Fails to Demonstrate that it is Likely to Succeed on the Merits

 "First Amendment rights are not absolute." *Braun v. Baldwin*, 346 F.3d 761, 763 (7th Cir. 2003). "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech … without regard to … the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund*, *Inc.,¸*473 U.S. 788, 799-800, 105 S. Ct. 3439, 3447 (1985). First Amendment cases involve fact-intensive inquiries. Neither Plaintiff's Complaint, nor the facts developed to date, entitle them to the extraordinary relief sought.

 Freedom of expression ranks near the top of the hierarchy of constitutional rights. *Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)(citing *Cohen v. California*, 403 U.S. 15, 24, 91 S. Ct. 1780 (1971)); *see also Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 152, 89 S. Ct. 935, 939 (1969) (describing citizens' right to assemble, parade, and discuss political issues in public streets and parks). Although the First Amendment applies to verbal expression, as well as symbolic or expressive conduct, *see The Coalition to March on the RNC and Stop the War v. St. Paul, Minn.* ("*St. Paul, Minn.*"), 557 F. Supp. 2d 1014, 1020 (D. Minn. 2008) (citations omitted), the freedom to engage in expressive conduct is more narrowly constrained than the freedom to engage in pure speech. *Id.* at 1021(citing *Cox v. Louisiana*, 379 U.S. 536, 555, 85 S. Ct. 453, 464-65 (1965)). Moreover, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired," *see Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S. Ct. 2559, 2564 (1981), or guarantee unlimited access to government property for expressive purposes. *Int'l*

Case 2:24-cv-00704-BHL   Filed 06/21/24   Page 16 of 34   Document 24

*Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678, 112 S. Ct. 2701, 2705 (1992). For example, the government may impose permit requirements to regulate competing uses of public fora. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130, 112 S. Ct. 2395, 2401 (1992).

In the context of speech regulations in a public forum, "the time, place, and manner of a speaker's activities can be regulated without violating the First Amendment so long as the restrictions are (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels for communication." *Marcavage v. City of Chicago*, 659 F.3d 626, 630 (7th Cir. 2011) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948, 74 L.Ed.2d 794 (1983)); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 2753 (1989).

To be content-neutral means that the regulation is not "because [the government] favors or disagrees with the message the speech conveys. *American Civil Liberties Union of Colorado v. City and County of Denver* ("*City and County of Denver*"), 569 F. Supp. 2d 1142, 1162 (D. Colo. 2008) (citing *Ward*, 491 U.S. at 791). The analysis is focused on the government's purpose, "not the effect that the restriction has upon a given speaker." *Id*. A content-neutral regulation is permissible, even if its operation affects some speakers more than others. *Ward*, 491 U.S. at 791, 109 S. Ct. at 2753(citing *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48, 106 S. Ct. 925, 929 (1986)).

A regulation satisfies the narrow tailoring requirement when "a substantial government interest … would be achieved less effectively absent the regulation[,]" and it does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. The government need not adopt the least restrictive alternative, but the

Case 2:24-cv-00704-BHL   Filed 06/21/24   Page 17 of 34   Document 24

regulation must not be "substantially broader than necessary to achieve the government's interest." *Id*. at 800. "An otherwise content-neutral regulation is not rendered invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.'" *City and County of Denver*, 569 F. Supp. 2d at 1163 (quoting *Turner Broadcasting System, Inc. v. F.C.C.*, 520 U.S. 180, 217, 117 S. Ct. 1174 (1997)).

Courts have previously recognized significant government interests justifying limitations on public speech to: prevent excessive noise, *see Ward*, 491 U.S. at 796-97, 109 S. Ct. at 2756, maintain public spaces, *see Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 296, 104 S. Ct. 3065, 3070 (1984), and to preserve order and public safety, including ensuring the free flow of traffic on streets and sidewalks, *see Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 375-76, 117 S. Ct. 855, 866 (1997). In addition, "maintaining physical security of persons and property involved in a high-profile event [such as political conventions and meetings of world leaders] is a government interest of 'the highest order." *City and County of Denver*, 569 F. Supp. 2d at 1163 (quoting *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1221 (10th Cir. 2007)).

The ample alternatives analysis "focuses on whether the speaker retains other reasonable opportunities to meaningfully communicate his or her message." *City and County of Denver*, 569 F. Supp. 2d at 1164. "[T]he 'ample alternatives' element is a multi-factor, fact-intensive inquiry." *Id*. Moreover, "[this] analysis cannot be conducted in an objective vacuum, but instead it must give 'practical recognition' to the facts giving rise to the restriction on speech." *St. Paul, Minn.*, 557 F. Supp. 2d at 1028 (quoting *Citizens for Peace in Space*, 477 F.3d at 1226). The ample alternatives analysis "does not *require* that the speaker have the ability to engage in precisely the same means of expression in precisely the same location, nor does it require that the

speaker have the ability to communicate in the same manner as he or she wishes." *City and County of Denver*, 569 F. Supp. 2d at 1164 (citing *Berger v. City of Seattle*, 512 F.3d 582 (9th Cir. 2008)). Indeed, "adequate alternatives may exist, even though the alternative channels do not necessarily permit the same quantity of speech, prohibit the preferred method of communication, or reduce the size of the potential audience." *Id.* (citing *Sullivan v. City of Augusta*, 511 F.3d 16, 44 (1st Cir. 2007)).

A. **The City's Extraordinary Event Ordinance is Constitutional as Written and as Applied to Plaintiff.**

Plaintiff's complaint alleges and its brief in support of their motion for preliminary injunction argues that the City's Extraordinary Event Ordinance ("Special Event Ordinance," or the "Ordinance") is not narrowly tailored and does not leave open ample alternatives to communicate their message. Plaintiff has not developed arguments regarding content neutrality and argued on facts which have since evolved in meaningful ways that the City's security interests are not significant or are merely speculative. Since Plaintiff's pleadings were filed, developments, as discussed more fully herein, have mooted additional questions raised by Plaintiff regarding interpretation and application of the Ordinance.

Plaintiff alleges that the Special Event Ordinance "bans a vast amount of protected speech across an arbitrarily large area, and is not narrowly tailored." (ECF No. 2, p. 16, 18-21). First, the ordinance as drafted applies only to the area of the downtown identified by the Secret Service as falling within its "preliminary security footprint" for the Convention. Second, Plaintiff dramatically overstates its impact on individual expression. In short, the ordinance is narrowly tailored both geographically and as a function of time and leaves open ample alternative channels for communication.

19

Over the last quarter century, the quadrennial presidential nominating conventions for the nation's two major political parties have given rise to numerous federal suits challenging the constitutionality of restrictions put in place during those events by the respective host cities. In *Serv. Emp. Int'l Union v. City of Los Angeles*, challenging restrictions related to the 2000 DNC, the Court observed that "there is no dispute that a narrowly tailored no activity zone is constitutionally permissible in order to ensure that delegates can enter and exit the [venue] safely. 114 F. Supp. 2d 966, 971 (C.D. Cal. 2000).

At the 2004 DNC in Boston, group demonstration activity within the soft security zone was limited to a 90 foot by 300-foot area near the delegate bus lot surrounded by an eight-foot-high chain link fence and semi-transparent mesh fabric. *Coalition to Protest Democratic Nat. Convention* ("*Coalition to Protest DNC*") *v. City of Boston*, 327 F. Supp. 2d 61, 66 (D. Mass. 2004); *see also Bl(a)ck Tea Society,* 378 F.3d at 14 (1st Cir. 2004) (upholding District Court's ruling that these restrictions were narrowly tailored). Demonstrators in Boston particularly sought to parade on Causeway Street, a major through-fare adjacent to the venue, designated as the southern dividing line between the hard zone and the soft zone. *Coalition to Protest DNC*, 327 F. Supp. 2d at 64. The District Court found that "the security planners had a real and significant interest in maintaining the maximum width possible on Causeway Street … for emergency vehicle access and evacuation purposes, to protect the large crowds at the [venue] and elsewhere within the hard zone." *Coalition to Protest DNC*, 327 F. Supp. 2d at 71. Citing public safety agency concerns about their ability to direct movement within the soft zone to evacuate and their interest in preventing bottlenecks at entry points, the District Court concluded that "a complete ban on parades on the Causeway Street sidewalk [while the Convention takes place] is narrowly tailored to significant interests in public safety." *Id*.

20

In a challenge arising from the 2008 RNC in St. Paul, the District Court noted that marches permitted at prior conventions "all terminated at rally sites away from the convention site entrances." *St. Paul, Minn.,* 557 F. Supp. 2d 1014, 1021 (D. Minn. 2008). Denial of the applicants proposed route was constitutional because "[plaintiff] cannot use the route for which it applied without substantially compromising significant government interests. Even if such a route were physically possible, the Court is obligated to consider the impact on public resources, traffic flow, and security. *St. Paul, Minn.*, 557 F. Supp. 2d at 1027 (internal citations omitted).

The 2008 DNC in Denver also involved "the closure of some streets in and around [the venue]." *City and County of Denver*, 569 F.Supp.2d 1143, 1163 (D. Colo. 2008). Such restrictions were likewise justified by legitimate concerns that parade activity could obstruct the street, hampering the ability of emergency vehicles to access the venue, and/or compromise evacuation plans. *Id*. at 1179. Similarly, the Second Circuit upheld restrictions imposed during the 2012 RNC observing that the government "certainly has a significant interest in keeping its public spaces safe and free of congestion." *Marcavage v. City of New York*, 689 F.3d 98, 104-106 (2d Cir. 2012).

Collectively, these cases demonstrate that convention host cities like the City of Milwaukee have significant public safety reasons to limit demonstrator's physical proximity to (1) the venue itself; (2) to delegates and attendees to facilitate their safe passage within the hard zone; and (3) to authorize designated parade routes which minimize the adverse impacts upon other aspects of the security plan.

The City of Milwaukee generally regulates "special events," like parades, processions, demonstrations, races or festivals, pursuant to MCO § 105-55.5. In Milwaukee special event permits are required for "any planned extraordinary, temporary use of the public right-of-way or

public premises, including sidewalks, streets, alleys, designated parking spaces and loading zones, or any other public space …[.]" MCO § 105-55.5(2)(f). The Special Event Ordinance supersedes this usual process during the Convention period only,[10] and applies only to events proposed within the "preliminary security footprint.[11]" (ECF No. 4-1, p. 5). General special event procedures remain in effect as to all other portions of the City of Milwaukee for the duration of the Convention. (ECF No. 4-1). Although the Ordinance acknowledges that the City "cannot accommodate parades or other special events on city streets inside the preliminary footprint, other than those permitted for the official parade route and official speaker's platform" its thrust is not prohibition but coordination.

The Ordinance contemplates that the City will establish an official parade route "as close as reasonably practicable to sight and sound distance from the entrance of the convention facilities … [and] may select alternative routes as necessary to accommodate crowds, and to ensure public safety and free movement of pedestrian and vehicular traffic." (ECF No. 4-1, p. 2, ¶ 2(g)). The City also commits to providing an official speaker's platform with City-provided amplification. (ECF #4-1, p. 2, ¶ 2(h)). Applicants may register, on a first-come-first-served basis, to use either the official parade route, the speaker's platform, or both. (ECF No. 4-1, p. 2, ¶¶ 4(b), 7, and 8; *see also* ECF No. 4-6).

### 1. The Special Event Ordinance is Narrowly Tailored.

Plaintiff claims that the Special Event Ordinance prohibits all First Amendment activity without a permit because it requires them to "navigate downtown *sidewalks* without obstructing

---

[10] "Convention period" means the time period commencing at 12:01 a.m. central daylight time on Saturday, July 13, 2024, and extending until 12:01 a.m. central daylight time on Saturday, July 20, 2024, or as further required for the completion of the Republican National Committee's Presidential nominating process. MCO § 105.55(2)(d).

[11] This area is defined by reference to a map reflecting its approximate boundaries as Water Street on the east, Clybourn Street on the south, 9th Street on the west, and Cherry Street to the north.

any doorways or pedestrian traffic, or interfering with traffic at crosswalks." (ECF # 2, p. 20). Not so. The Ordinance allows persons or groups to "stand, loiter or travel upon the streets … if their presence does not interfere with vehicular traffic." (ECF #4-1, p. 2, ¶ 11). Indeed, the City will restrict vehicle access on Vel R. Phillips Avenue and MLK Drive south of Vliet Street to the fence-line on the north side of McKinley Avenue. (DeSiato Decl. ¶ 13). Thus, individuals and groups may move freely along the sidewalk on the north of McKinley, and may occupy and move about those streets and sidewalks south of Vliet Street.

Plaintiff further alleges that the Special Event Ordinance "makes it unlawful for any two or more people to travel in unison with a common purpose upon the streets so as to interfere with the normal traffic flow or regulation of vehicular or pedestrian traffic." (ECF #2, p. 20-1). This claim overstates its reach. The Ordinance simply prohibits unauthorized use of the official parade route and/or speaker's platform, and limits parades to the designated route. It does not prohibit groups from traveling in unison or with a common purpose, but only doing so to interfere with traffic. In other words, persons or groups moving about the vehicle exclusion zone must obey state traffic laws. Wis. Stat. § 346.29(2) ("No person shall stand on any roadway other than in a safety zone if such act interferes with the lawful movement of traffic."). Furthermore, nothing in the Ordinance prohibits persons from marching on sidewalks or streets within the footprint provided that: (1) they do not interfere with registered parades on the designated route; and (2) do not interfere with the normal flow of pedestrian and vehicular traffic.

## 2. The Ordinance Leaves Open Ample Alternatives for Communication to Delegates, Attendees, and the Media.

At the outset, Defendants note Plaintiff's reliance throughout its filings on the phrase "sight and sound." As a matter of constitutional jurisprudence, it is a phrase without consequence. In *Bl(a)ck Tea Society*, concerning the 2004 DNC Convention, the court observed:

23

First, although the opportunity to interact directly with the body of delegates by, say, moving among them and distributing literature, would doubtless have facilitated the demonstrator's ability to reach their intended audience, **there is no constitutional requirement that demonstrators be granted that sort of particularized access.** Second … the … argument greatly underestimates the nature of modern communications. At a high profile event, such as the Convention, messages expressed beyond the first-hand sight and sound of the delegates nonetheless have a propensity to reach the delegates through television, radio, the press, the internet, and other outlets.

378 F. 3d at 14 (emphasis added).

In *City and County of Denver*, addressing similar complaints regarding the plans for the 2008 DNC, the Court observed that "the phrase 'sight and sound' as being a measure of the maximum acceptable distance between a speaker and his or her intended audience, is not a standard used by the Supreme Court in its First Amendment jurisprudence." 569 F. Supp. 2d at 1180. This is so, posited the Court, at least in part because:

[I]t is unclear what [the] legal or practical parameters [of "sight and sound"] are … From whose vantage point is "sight and sound" measured—the speaker or the audience? … Is a speaker within "sight" if she is merely within the range of normal visual perception … [or] does "being within sight" limit the range to that in which a speaker can be identified as a person, or where attributes of that person can be distinguished, or when a sign with text of a particular size held by the speaker can be read by the viewer?

569 F.Supp.2d at 1181. Similar questions can be raised regarding what constitutes within "sound." *Id*. As such, the question posed herein is not whether the City's plan locates speakers within "sight and sound" of delegates and attendees but whether the location(s) affords speakers sufficient opportunity to convey their message to this target audience.

Turning then to Plaintiff's arguments, they assert that: 1) a singular parade route is insufficient to satisfy the First Amendment; 2) the then-unknown time slot is insufficient[12], 3) the

---

[12] The City has continually assured Plaintiff that time-slots would be awarded on a first-come-first-served basis, and that their application was the first received. They requested a parade on the first day of the Convention. Although their time-slot was not formally confirmed before the filing of Plaintiff's complaint, its timing was hardly a mystery.

time restrictions on when parades may occur is inadequate[13]; and 4) that the park spaces designated by the City is insufficient.[14]

Plaintiff offers no support for the proposition that a singular parade route is insufficient. To the contrary, in consideration of the immense security and logistical concerns the Official Parade Route offered is more than constitutionally sufficient. The Official Parade Route passes by multiple delegate hotels, and as near as feasible to the primary media filing center at the Baird Center. In *St. Paul*, the Court considered the visibility of the route, access to media work spaces, and alternative public viewing areas, in concluding that ample alternatives existed and denying the plaintiff's request for injunctive relief. 557 F. Supp. 2d at 1029-31. The City of Milwaukee has provided these same alternatives here.

Second, Plaintiff argues that a single, limited parade slot and time restrictions around when parades may occur are constitutionally inadequate. Plaintiff contends that the proposed times offer insufficient time to arrive after getting off from work and that delegates are likely to arrive before or leave after the times allotted for parades – but Plaintiff has no constitutional right to physical access to the delegates. *Citizens for Peace in Space,* 477 F.3d at 1225; *Bl(a)ck Tea Society,* 378 F.3d at 14. Additionally, Plaintiff offers no citations or support for their assertions as to the expected arrival time of delegates and make similarly unfounded assumptions about theoretical demonstrators' standard work day. Moreover, Plaintiff itself requested a mid-day parade start time.

Plaintiffs cite *Service Employees Intern. Union, Local 5 v. City of Houston*, 595 F.3d 588, (5th Cir. 2010) for the proposition that ordinances limiting parades to specific times can be

---

[13] Although Plaintiff argues that the times during which parades may occur are insufficient, they requested a start-time within the hours established by the EEO.

[14] Plaintiff devotes much of its brief to arguing that Pere Marquette Park is inadequate. Defendants reply will focus on Official Parade Route and Official Speaker's Platforms announced on Friday, June 21, 2024.

struck down as unconstitutional. (ECF No. 2, p. 24). But that case is factually distinct from the present situation. *Service Employees Intern. Union Local 5* did not involve a National Special Security Event. *See Id.* Furthermore, the parade ordinance at issue there limited all weekday parades to two one-hour windows. *Id.* at 603. Here, the Official Parade Route is available for an eight-hour block daily throughout the Convention. (ECF No. 4-1). In short, *Service Employees Intern. Union Local 5* is inapposite. Moreover, the First Amendment does not guarantee access to "every or even the best channels or locations for their expression[,]" *see Marcavage,* 689 F.3d at 107, and Plaintiff has not shown that altering the start time or parade route materially affects its ability to communicate its message. *St. Paul, Minn.*, 557 F. Supp. 2d at 1031.

Indeed, the City has provided opportunities to all wishing to express their First Amendment rights during the RNC, including:

- The Official Speaker's Platform at Zeidler Union Square Park;

- The Official Speaker's Platform on MLK Drive;

- The Official Parade Route;

- The North Public Viewing Area;

- The South Public Viewing Area;

- The use of megaphones, bullhorns, and portable battery-operated sound amplification devices within the preliminary security footprint; and

- Freedom to walk about the preliminary security footprint subject only to state traffic laws.

Moreover, any argument that the Special Event Ordinance burdens more speech than necessary, or fails to leave open reasonable opportunities to convey its message "greatly underestimates modern communications." *Bl(a)ck Tea Society*, 378 F.3d at 14. At a high profile event, like the RNC, "messages expressed beyond the first-hand sight and sound of the delegates

26

nonetheless have a propensity to reach the delegates through television, radio, the press, the internet, and other outlets." *Id.*

### B. The Ordinance Does Not Constitute a Prior Restraint.

Plaintiff complains it "has been seeking a parade permit – or at least some bare indication of where they would be able to march – for *more than a year* since the Coalition submitted its original applications," and that this constitutes an unconstitutional prior restraint. (ECF No. 2, p. 28). This is belied by the record.

Citing inapposite cases, (involving the zoning and licensing of adult entertainment in *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) and *11126 Baltimore Blvd., Inc. v. Prince George's Cty.*, 58 F.Ed 988 (4th Cir. 1995) and a registration requirement for "professional fundraising consultants" in *American Target Advert., Inc. v. Giani*, 199 F.3d 1241 (10th Cir. 2000)), the Coalition claims the Ordinance fails to provide a time-frame within which the Commissioner of the Department of Public Works ("Commissioner") must issue a determination on their application. For the reasons set forth in Section C herein, the ordinance itself constrains the discretion of the Commissioner so that he may only deny applications in very limited circumstances.

Contrast the cases cited by Plaintiff with a factually similar one: In *St. Paul, Minn.,* an association of "groups and individuals interested in parading within sight and sound of the [convention venue]" seeking permission to march directly adjacent to the host venue for the 2008 RNC, brought claims against the host city. 557 F. Supp. 2d at 1016. Although their complaint raised claims under the First and Fourteenth Amendments, the District Court considered their motion under the First Amendment only because "[the Coalition's] arguments related to procedural due process essentially restate those asserted in connection with the First

Amendment. *Id*. at 1021(citing *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1258 n. 5 (10th Cir. 2004)).

There, as here, the applicants first sought a permit to march their preferred route long before Convention plans coalesced. *St. Paul, Minn.*, 557 F. Supp. 2d at 1017 (first application 10 months before event). The City ultimately granted them a parade permit albeit the route, start time, and end time differed from those sought. *Id*. at 1019. Those applicants ultimately sought a preliminary injunction arguing that the city's delay in acting on its application "belies Defendants' assertion that their decision was content-neutral … [and the Coalition's] permit should have issued long ago such that the [2008 RNC] would have been planned around its parade." *St. Paul, Minn.*, 557 F. Supp. 2d at 1022-23. The District Court considered the holding in a similar case about demonstration activity at the 2002 Winter Olympics:

> It may be convenient for applicants to have nearly a year to 'orchestrate their protests and demonstrations,' but they have no constitutional right to demand that city officials make decisions affecting countless other people so long before interrelated decisions have been made. It was reasonable for the City to work out arrangements for the location and timing of Olympic venues, along with attendant security and public health and safety concerns, and then turn its attention to applications for demonstration permits.

*Utah Animal Rights Coal.*, 371 F.3d at 1261. Finding that "there is no constitutional requirement of a fixed deadline by which the government must act under a content-neutral permit scheme … and there is no evidence that Defendants disfavored or sought to stifle the Coalition's message[,]" plaintiff's request for preliminary injunction was denied. *St. Paul, Minn.*, 557 F. Supp. 2d at 1023. (citations omitted).

In this case, as in the case arising from the 2008 RNC Convention, Plaintiff has received assurances that they would receive a permit to demonstrate and there is no evidence that Defendants' actions were "anything but content neutral." *Id*. at 1024. The City consistently has made clear to Plaintiff, through statements to its counsel, that a registration for a parade would

28

issue to Plaintiff, and that they were in fact "first in line" among applicants for their preferred date and time. (Block Decl. ¶¶ 6-22). The City also consistently communicated to Plaintiff's counsel that the official parade route and speaker's podium would be announced two to four weeks prior to the RNC, and that any delay is due to the extensive planning, including decisions made by the Secret Service concerning the security footprint and the credentialed zone, that the City does not control. (Block Decl. ¶¶ 19, 22).

It is also specious to claim the Plaintiff has had no indication of where they will be allowed to conduct a parade. The ordinance itself limited placement of the official parade route "within the preliminary security footprint." (Ordinance § 1-g). Earlier today, the Secret Service announced the location of the secure perimeter zone and the vehicle screening zone and the City made announcements about the Official Parade Route and the two speakers platforms. (Kruschke Decl. ¶ 11; DeSiato Decl. ¶¶ 12-16). The City separately notified applicants, including Plaintiff, via email and provided additional detail about when final time-slot assignments will be made. (DeSiato Decl. ¶ 17, Ex. 3). Plaintiff now knows the route with certainty.

It is clear that what Plaintiff wants is the right to *the specific route* they have selected and *on the date* and *for the length of time* of their choosing. The Constitution does not require this, as demonstrated by the decision in *St. Paul*. The Coalition has not been chilled in the exercise of their First Amendment rights, as they have advertised, both on their website and in public comment, that it is their intention to conduct a parade on July 15, apparently without a registration for the official parade route. (Block Decl. ¶ 27, Ex.3; Reynolds Decl. ¶¶ 4-6, Ex. 1).

## C. The Ordinance Is Not Arbitrary and Discriminatory

The Special Event Ordinance sets forth clear guidelines for the Commissioner that prevent arbitrary or discriminatory denial of an application, or revocation of an already granted registration. *Bence* at 501 F.2d at 1190. In fact, the Commissioner is only allowed to deny an

application or revoke a registration in two circumstances: (1) "a false or incomplete statement made in the application for the registration or because of any violation of any provision of the ordinance" or (2) "a determination by the Commissioner of Public Works that an applicant, or persons represented by the applicant, have previously engaged in violent or destructive conduct in connection with a previous parade or other public assembly, in violation of any provisions of the Milwaukee Code of Ordinances or any state or federal laws." (Ordinance § 9).

The Commissioner clarified today that in making this second determination, only an adjudication of guilt or a conviction within the last 7 years for of the violation of such an ordinance, state, or federal law, either on the part of the applicant, or a person with whom the applicant presently intends to utilize the official parade route with the applicant, would suffice for purposes of this determination. (Kruschke Decl. ¶ 12, Exs. 6-7). Plaintiff therefore had and has no reason to doubt that their registration (receipt of which had been acknowledged) would issue.

City officials are also empowered under the Ordinance to suspend or terminate a registration, "effective immediately in the event of severe weather or a large-scale civil disturbance involving violence or danger to persons or extensive property damage…." (Ordinance § 10). Notice of a termination or suspension of this type must be provided "to the applicant via electronic means or in person communication, and a public notice shall be issued to the media." *Id.* Although undefined, severe weather and large-scale civil disturbances, as those terms are used in the ordinance, must involve either violence or danger to persons or extensive property damage. The requirement to issue a media statement regarding any suspensions or terminations of this sort provides its own check on the power of the Commissioner – determinations made by the Commissioner will obviously not be made lightly and with regard to

one applicant, but only in the event of the sort of emergent circumstances the City could reasonably anticipate arising during the RNC.

### III.    Plaintiff Cannot Meet the Remaining Criteria for A Preliminary Injunction.

While Plaintiff's failure to demonstrate a likelihood of success on the merits should alone be dispositive of this matter, Plaintiff similarly fails to satisfy the remaining criteria for entitlement to a preliminary injunction. *See Winter*, 555 U.S. at 20, 129 S. Ct. at 374 (2008). Plaintiff cannot establish irreparable harm. The balance of equities and the public interest weigh much more heavily in favor of denying the requested preliminary injunction.

A preliminary injunction is an extraordinary remedy. *Munaf v. Geren*, 553 U.S. 674, 688, 128 S. Ct. 2207, 2218 (2008); *see also Yakus v. United States*, 321 U.S. 414, 440, 64 S. Ct. 660, 674 (1944) ("The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff."). Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," *see Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542, 107 S. Ct. 1396, 1402 (1987), and pay particular regard to "the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S. Ct. 1798, 1803 (1982); *see also Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S. Ct. 643 (1941).

With respect to irreparable harm, Plaintiff largely argues that the City's failure to issue a decision on its application or to provide a confirmed parade route map left it unable to plan its protest or organize, which in turn has impeded its ability to recruit people to its cause. (ECF No. 2, p. 31). However, Plaintiff has been assured through counsel for months prior to the filing of this action that Plaintiff was at the front of the first-come first-serve line for the parade date and

31

time of its choice.  (Block Decl. ¶ 16).  The City publicly announced the Official Parade Route this morning—on the same day that the Secret Service made public its security perimeters. (Kruschke Decl. ¶ 11; DeSiato Decl. ¶¶ 12-16).  Individuals and representatives of organizations with pending registration applications also received correspondence advising them of the timeline upon which they will receive confirmation of their Official Parade Route time slots and/or speaker's platform time slots.  (DeSiato Decl. ¶ 17, Ex. 3).

Moreover, Plaintiff's own recent statements belie their allegation of irreparable harm.  On June 17, 2024, Plaintiff's representative Omar Flores made a number of public statements.

- Plaintiff affirmatively stated its intention to march regardless of whether they receive a registration for the Official Parade Route. (Reynolds Decl. ¶¶ 4-6, Ex. 1; https://www.cbs58.com/news/coalition-to-march-on-the-rnc-rejects-city-of-milwaukees-offer-for-protest-route; Block Decl. ¶ 27, Ex. 3; https://twitter.com/fightbacknews/status/1801624122880864276)

- Plaintiff is not concerned with any consequences of marching without a permit. (*Id.*)

- Plaintiff intends to bring large number of its own parade marshals and medics to facilitate its planned parade.  (Reynolds Decl. ¶¶ 4-6, Ex. 1; https://www.cbs58.com/news/coalition-to-march-on-the-rnc-rejects-city-of-milwaukees-offer-for-protest-route).

- Sometime on or after the afternoon Monday, June 17, 2024, Plaintiff made a post to the blog section of its website, https://www.marchonrnc2024.org/blog/all-out-for-march-on-rnc, Plaintiff will be holding an online report and mobilization plans

32

meeting on Monday, June 24, 2024 at 7:00 p.m. Coalition to March on the RNC's website, blog section.

In short, Plaintiff has not established its identified irreparable harm, nor does any harm appear imminent. The Court has "wide discretion in making judgments regarding the appropriateness *vel non* of preliminary injunctive relief." *Coalition to Protest DNC*, 327 F. Supp. 2d at 69 (citing *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)). Even if relief is to be issued in a suit like this:

> [T]he court 'cannot simply order whatever a City is physically capable of doing, without regard to considerations of public health, safety, convenience and cost,' but rather 'must make a sound exercise of equitable discretion that considers all relevant circumstances. The invalidity of a permit regulation cannot automatically entitle a plaintiff to holds its event precisely as it wishes.'

*Coalition to Protest DNC*, 327 F. Supp. 2d at 69 (quoting *Million Youth March v. Safir*, 155 F.3d 124, 126 (2nd Cir. 1998)).

For many reasons, the balance of equities and public interest favor denying the requested preliminary injunction. Plaintiff would prioritize marching its preferred parade route and approaching RNC venues in the manner it finds sufficient for "sight and sound." However, as outlined extensively in the fact section, years of extensive security planning and planning for public welfare, including that related to protection of Secret Service protectees, went into developing the security plan for the RNC. If for no other reason that this, Plaintiff's injunction request must be denied – Plaintiff's proposed parade route traverses directly beneath one of the RNC venues, the Baird Center, a building with a significant amounts of glass used in its façade, and which during the RNC will house 15,000 members of the media and their filing center, as well as RNC events.

33

Plaintiff asks this Court to allow 5,000 people to march from Red Arrow park, a property the City does not own, down Water Street (a major through-fare), across the Wisconsin Avenue bridge (a street by which 8,000 delegates may enter the secure perimeter), underneath the Baird Center (a Convention venue), traversing north on 6th Street and east on Juneau Avenue (encircling the Fiserv Forum where delegate buses will arrive and depart), and back across the river over the Knapp Street bridge, and south on Water Street back to Red Arrow park. (ECF No. 3-1). Plaintiff further intends that the crowd will stop at various points along this route to "rally and host speakers." (Flores Decl. ¶ 24).  For all the reasons discussed herein, Plaintiff's proposed route is not merely unworkable but contemplates violating federal law. 18 U.S.C. § 1752. (Gibson Cucchino Decl. ¶7). Plaintiff's request for preliminary injunction must therefore be denied.

Dated and signed at Milwaukee, Wisconsin this 21st day of June, 2024.

EVAN C. GOYKE
City Attorney


s/ Clint B. Muche
CLINT B. MUCHE
Assistant City Attorney
State Bar No. 1131629
Email: cmuche@milwaukee.gov
JENNIFER WILIAMS
Deputy City Attorney
State Bar No. 1058087
Email: jewill@milwaukee.gov
JULIE WILSON
Assistant City Attorney
State Bar No. 1034792
Email: jwilson@milwaukee.gov
*Attorneys for Defendants*

ADDRESS:
800 City Hall
200 E. Wells Street
Milwaukee, WI 53202
Telephone: (414) 286-6195
Facsimile: (414) 286-8550
1081-2024-988/291769