UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

COALITION TO MARCH ON THE RNC,

                     Plaintiff,                                  Case No. 24-cv-0704-bhl

    v.

CITY OF MILWAUKEE, CAVALIER JOHNSON,
JERREL KRUSCHKE, and KIMBERLY A. CHEATLE,

                     Defendants.

---

## DECISION AND ORDER

---

       For the second Presidential election in a row, the City of Milwaukee has been selected to host the national nominating convention for one of the country's two main political parties.  In the prior election cycle, the Democratic National Committee chose Milwaukee to host its 2020 National Convention, but the selection became a non-event for the City when COVID-19 forced the party to conduct most events remotely.  Milwaukee got a second shot, however, when the Republican National Committee selected Milwaukee as the host city for its 2024 nominating convention.  The Republican National Committee's "Committee on Arrangements" has scheduled events to run from July 15 through July 18, 2024 at a number of locations in downtown Milwaukee, with the final nomination expected to take place at the Fiserv Forum on the evening of July 18.

       Since Milwaukee's selection as host city, security planners, including law enforcement personnel, city officials, and the United States Secret Service, have been working to ensure the convention takes place safely and with limited disruption to the City's daily life.  The plans have included the announcement of preliminary and final security zones around the venues where convention activities will take place and the City's enactment of a Special Event Ordinance.  Security for the event is heightened because some of the expected attendees receive special protection under federal law and the convention has been designated as a National Special Security Event.  Planners understand that protests are likely and have taken steps to allow protestors to express their views.  The Special Event Ordinance includes a permitting scheme allowing use of two Speaker's Platforms on the north and south sides of the convention's main venues and protest marches along an Official Parade Route on each day of the convention.  Individuals are also

allowed to stand, march, or protest throughout much of the security footprint, so long as they do not interfere with traffic or the Official Parade Route.

Plaintiff Coalition to March on the RNC (the Coalition) is an unincorporated association of more than seventy organizations formed for the specific purpose of holding a protest parade at the convention. The Coalition is among more than 100 applicants that have applied for permits to parade in protest against the RNC. The City has granted the Coalition a permit for the parade, which will take place on the date and time the Coalition requested, but using a designated Official Parade Route. Unsatisfied, the Coalition has sued the City of Milwaukee, its Mayor, Cavalier Johnson, its Commissioner of Public Works, Jerrell Kruschke, and the Director of the United States Secret Service, Kimberly Cheatle, contending that the Special Event Ordinance violates Coalition members' First and Fourteenth Amendment rights. The Coalition's main request for relief is a preliminary injunction that would require the City to allow the Coalition to parade along its preferred route. The Coalition also asks the Court to enjoin the City from enforcing two aspects of its Special Event Ordinance, concerning (1) the City's right to revoke parade or protest permits from participants who have convictions for previously engaging in violent protest; and (2) a prohibition on protesters conducting "parades" other than those taking place with a City permit at the time and place the City has prescribed. The parties agreed to submit these issues without oral testimony, and the Court heard argument on July 3, 2024. For the reasons explained below, the Coalition's motion is granted in part and denied in part. Under longstanding Seventh Circuit law, the City is enjoined from revoking parade or protest permits based solely on participants' or their associates' prior criminal convictions. But the balance of the Coalition's requested injunctive relief is denied.

## FINDINGS OF FACT

### 1. THE PARTIES

Milwaukee will play host to the Republican National Committee's national nominating convention from July 15 through July 18, 2024. (ECF No. 26 ¶4.) Plaintiff Coalition is an unincorporated association of individuals from a broad range of local, national, and grassroots, community and labor organizations who have come together to hold a protest parade and march at the convention; as of the date this suit was filed, more than six dozen organizations[1] had joined the Coalition. Predecessor organizations to the Coalition have organized demonstration marches

---

[1] For a full list of the organizations comprising the Coalition, see ECF No. 3-3.

around prior national conventions in different parts of the United States, including marches on the Republican National Conventions in 2008, 2012, and 2016. (ECF No. 40 ¶1.)

Defendant City of Milwaukee (the City) is an incorporated municipality and political subdivision of the State of Wisconsin; Defendant Cavalier Johnson is the duly elected mayor of the City; Defendant Jerrell Kruschke is the Commissioner of Public Works for the City (collectively, the City Defendants). (*Id.* ¶¶2–5.) Defendant Kimberly A. Cheatle is the Director of the United States Secret Service (Secret Service). (ECF No. 33 ¶14.)

## 2. THE 2024 REPUBLICAN PARTY NOMINATING CONVENTION

On September 24, 2018, the Secretary of Homeland Security designated the Republican National Committee's nominating convention as a recurring National Special Security Event. (ECF No. 40 ¶8.) On August 5, 2022, the Republican National Committee announced that it would hold its 2024 nominating convention in Milwaukee. (*Id.* ¶9.) The City has been planning for the event since that time. (*Id.* ¶34.) The City expects more than 50,000 delegates, staff, visitors, press, and law enforcement personnel to attend. (*Id.* ¶35.) Major convention events will be held at Fiserv Forum, Baird Center, UW-Milwaukee Panther Arena, Miller High Life Theatre, and the Milwaukee County Historical Society (the Convention Venues). (*Id.* ¶18; ECF No. 26 ¶4.)

The Secret Service is charged with planning, coordinating and implementing security operations at special events of national significance, including the upcoming convention, pursuant to 18 U.S.C. § 3056(e)(1). (ECF No. 40 ¶11.) The Secret Service is also charged with protecting former Presidents and Vice Presidents, their spouses, as well as major party Presidential and Vice Presidential candidates within 120 days of an election. (ECF No. 26 ¶7); *see also* 18 U.S.C. § 3056(a). The Secret Service is thus the lead federal agency responsible for designing, planning and implementing security measures for the convention. (ECF No. 40 ¶12.) Special Agent Audrey Gibson Cicchino was selected as 2024 Republican National Convention Coordinator for the Secret Service in April 2023. (ECF No. 26 ¶¶1, 3.) Gibson Cicchino relocated to Milwaukee in August 2023 to work full-time on security planning for the event; an Assistant Convention Coordinator also relocated to Milwaukee around the same time and has been working full-time on security planning. (*Id.* ¶3.) Gibson Cicchino has more than 15 years' experience with the Secret Service, including more than four years with its Protective Intelligence Division. (*Id.* ¶2.) She has previously been assigned as an advance agent for large-scale events including the G20 Summit, the ASEAN Summit, a G7 Summit, the 2018 Winter Olympic Games, and has worked on security planning for major events both domestically and abroad. (*Id.*)

The Secret Service anticipates six to eight thousand delegates will attend events at the Convention Venues and other locations in Milwaukee during the convention. (ECF No. 40 ¶14.) Political leaders, including individuals subject to the Secret Service's statutory protection duties, will also attend. (*Id.* ¶13.) Other attendees will likely include the Republican Party's major campaign contributors and lobbyists. (*Id.* ¶15.) Delegates will be housed at more than 110 hotels in the area. (*Id.* ¶16.) The Milwaukee Police Department (MPD) has worked closely with the Secret Service over many months to develop a security plan for the event. (*Id.* ¶27.) The City has or will execute separate contracts with approximately 80 political subdivisions within the state and with the state itself for additional law enforcement personnel and for National Guard service members to temporarily supplement its force during the convention. (*Id.* ¶28.) As many as 4,500 police officers from agencies outside of Milwaukee could be required. (*Id.* ¶29.) Congress designated $75 million for the City of Milwaukee to cover its costs on security measures. (*Id.* ¶36.)

Neither the City nor the Secret Service decides what events will occur at the convention. The Republican National Committee's Committee on Arrangements is responsible for planning the events, including where and when those events will occur. (*Id.* ¶17.) The Convention Venues are privately-owned facilities located in downtown Milwaukee adjacent to high density commercial and residential areas. (*Id.* ¶¶19–20.) The Convention Venues are located within an area (the Convention Site) that is one to two city blocks wide and five blocks long, bounded by Juneau Avenue on the north and Wisconsin Avenue on the south. (*Id.* ¶22.) Fiserv Forum sits south of Juneau Avenue and east of 6th Street; Miller High Life Theatre and Panther Arena lie one block south of Fiserv Forum, between State Street and Kilbourn Avenue; Milwaukee County Historical Society is one block due east of Panther Arena; Baird Center sits another block further south of Panther Arena and the theatre. (*Id.* ¶23.) The Convention Site is oriented from north-to-south, with major points of ingress and egress located on cross-streets running east-and-west, particularly along its eastern perimeter, except for highway access to the west via McKinley Avenue. (*Id.* ¶24.) The Milwaukee River flows north-to-south to the east of Fiserv, heading east away from the convention sites between the State Street bridge and the Wisconsin Avenue bridge. The river serves as a natural eastern boundary near the top of the Convention Site; a physical barrier will delineate the eastern hard perimeter below State Street. (*Id.* ¶25.)

The planners acknowledge that the convention presents a significant opportunity for individuals and organizations to participate in the democratic process through the exercise of their

rights of free speech and assembly. (*Id.* ¶32.) More specifically, they also admit that the convention provides a chance for groups and individuals to voice their opinions to the leaders and decision-makers of the Republican Party, to national and international media, and to people across the country and around the world who will watch coverage of the convention. (*Id.* ¶33.)

### 3. CITY ORDINANCES

The City generally regulates special event permits under Milwaukee Code of Ordinances (MCO) § 105-55.5. (*Id.* ¶51.) MCO § 105-55.5 defines "Special event" as "any planned extraordinary, temporary use of the public right-of-way or public premises, including sidewalks, streets, alleys, designated parking spaces and loading zones, or any other public space under the jurisdiction of the department of public works for . . . a parade, procession, demonstration, race or festival." (*Id.* ¶52.) On March 19, 2024, the City adopted Milwaukee Common Council File No. 231740, an ordinance relating to the upcoming convention (the Special Event Ordinance) to be effective April 6, 2024. (*Id.* ¶¶56–57.) The Special Event Ordinance provides that "[r]egistrations for the use of public streets and public property during the 2024 [nominating convention] inside the preliminary security footprint may be granted only in accordance with this extraordinary event ordinance," and directs city officials to "suspend the granting of special event permits as indicated in section 12." (*Id.* ¶58.) Section 12 provides that the City of Milwaukee "cannot accommodate parades or other special events on city streets inside the preliminary security footprint, other than . . . the official parade route and official Speaker's Platform." (*Id.* ¶59.) The Special Event Ordinance applies only during the convention period and only within the preliminary security footprint. All other special events at other times or locations remain subject to MCO § 105.55-5. (*Id.* ¶60.)

The Special Event Ordinance defines "convention period" as "12:01 a.m. central daylight time on Saturday, July 13, 2024, and extending until 12:01 a.m. central daylight time on Saturday, July 20, 2024, or as further required for the completion of the . . . nominating process." (*Id.* ¶61.) The ordinance defines a "parade" as "any formation, march, or procession of any kind traveling in unison for a common purpose upon the streets, excluding sidewalks, within the city that interferes with the normal flow or regulation of vehicular or pedestrian traffic upon the streets within the city." (*Id.* ¶62.) The "preliminary security footprint" is defined by reference to a map identifying its approximate bounds as Cherry Street on the north, running along Water Street on the east, Clybourn Street on the south, and 9th Street on the west. (*Id.* ¶63; ECF No. 4-2.) The "security footprint" is separately defined as "the area designated by the United States Secret Service as

requiring limited pedestrian or vehicle access associated with the convention." (ECF No. 40 ¶64.) The "Credentialed [Z]one" means the area in the security footprint to which access is restricted . . . to authorized and credentialed persons consistent with the National Special Security Event designation pursuant to 18 U.S.C. § 3056(e)(1). (*Id.* ¶65.) The ordinance also provides that "[a] person or group of pedestrians may stand, loiter or travel upon the streets in the security footprint only if their presence does not interfere with vehicular traffic, consistent with s. 101-1-2 of the [Milwaukee] Code of Ordinances, which adopts s. 346.29(2), Wis. Stats." (*Id.* ¶68.)

The Special Event Ordinance authorizes City officials to deny or revoke any parade or Speaker's Platform registration because of (1) "[a]ny false or incomplete statement made in the application for the registration or because of a violation of any provision of the ordinance"; or (2) "[a] determination by the Commissioner of the Department of Public Works that an applicant, or persons represented by the applicant, have previously engaged in violent or destructive conduct in connection with a previous parade or other public assembly, in violation of any provisions of the Milwaukee Code of Ordinances or any state or federal laws." (ECF No. 7-6, § 9a-1, a-2.) On June 21, 2024, pursuant to subsection 6-b of the ordinance, Commissioner Kruschke announced standards for applying subsection 9a-2:

> Enforcement of § 9-a-2. Any denial or revocation of a registration granted under the [Special Event] Ordinance made pursuant to § 9-a-2 shall be based upon a finding that the applicant, or persons represented by the applicant, have been convicted or adjudicated guilty of engaging in violent or destructive conduct in connection with a previous parade or other public assembly in violation of the Milwaukee Code of Ordinances or any state or federal laws within the last 7 years.

(ECF No. 28 ¶12.) This guidance is published on the City's website. (*Id.*; ECF No. 28-6 at 5.) The ordinance provides for a prompt appeal hearing before Commissioner Kruschke in the event of a denial or revocation under Section 9. (ECF No. 7-6, § 9b.) Decisions of the Commissioner made on appeal pursuant to subsection 9b "shall be final." (*Id.*) Violations are subject to a fine of up to $500 and imprisonment if not paid. (ECF No. 40 ¶66.)

## 4. SECURITY PLANS

Security planning for the convention was informed by law enforcement professionals, as well as experts in public health and safety, emergency and disaster response, traffic flow, and other fields. (ECF No. 26 ¶12.) The Secret Service's security planning considered numerous potential security threats, including: terrorist attacks, lone gunmen, fire, environmental hazards, chemical or biological attacks, structural safety concerns, vehicle attacks and suicide bombers. (*Id.* ¶11.) The Secret Service also considered citizens' First Amendment rights, public safety, the needs of residents and businesses in the vicinity, traffic flow and transportation needs, and on-going law enforcement needs unrelated to the event in its security planning. (*Id.* ¶15.)

Vehicle and pedestrian access to the Convention Venues and the surrounding vicinity are critical aspects of the Secret Service's security plan. (*Id.* ¶16.) The Secret Service determined the contours of the Secure Perimeter based on technical assessments and evaluations. (*Id.* ¶19.) These assessments and evaluations included consideration of the risk of person-borne explosives, the physical features and elevations of the Convention Venues, the effective range of weapons, and emergency ingress and egress routes. (*Id.*) The urban setting of the Convention Venues was an additional complicating factor. (*Id.*)

The "Secure Perimeter," sometimes also called the "pedestrian restricted perimeter" or "credentialed zone," will be closed to vehicles and pedestrians, and will be delineated by a non-opaque security fencing and other barriers. (ECF No. 40 ¶69.) Only persons with a credential or event ticket will be permitted to enter the Secure Perimeter. (*Id.* ¶70.) The Secure Perimeter encompasses all of the Convention Venues and their immediate proximity. (*Id.* ¶71.) The Secure Perimeter extends across the parade route originally proposed by the Coalition at several points. (*Id.* ¶72.) Entry into the Secure Perimeter will be permitted only at designated access points. (*Id.* ¶73.) Prior to entry, persons with credentials or event tickets will be required to pass through a magnetometer or similar screening. (*Id.* ¶74.) The Secure Perimeter north of Fiserv Forum will be delineated by a fence line along the north side of McKinley Avenue from MLK Drive to Fond du Lac Avenue (a/k/a Highway 145). (*Id.* ¶75.) The southern border of the Secure Perimeter mostly falls along Wisconsin Avenue. (*Id.* ¶76.) Maritime restrictions will be in place on the Milwaukee River. (*Id.* ¶77.) The Secure Perimeter extends east across the Milwaukee River at Knapp Street at the "top" of the Convention Site. (*Id.* ¶78.) The eastern border of the Secure Perimeter lies further west toward the "bottom" of the Convention Site, excepting the area immediately adjacent to the Milwaukee County Historical Society and Pere Marquette Park. (*Id.*

¶79.) Pedestrian and vehicle access points into/out of the Secure Perimeter along will lie on cross streets extending along MLK Drive. (*Id.* ¶80.)

The Vehicle Screening Perimeter surrounds the Secure Perimeter, encompassing a larger area. (*Id.* ¶¶81–82.) Pedestrians may enter and exit the vehicle screening zone without being screened. (*Id.* ¶83.) Drivers may access the Vehicle Screening Perimeter without a credential or event ticket, but Vehicles may enter only through designated vehicle screening points. (*Id.* ¶¶84–85.) Designated vehicle screening points will be located so as to enable traffic to access the Secure Perimeter from multiple directions. (*Id.* ¶86.) Security planners anticipate that cars will line up to wait at vehicle screening points because the screening process takes several minutes to complete. (*Id.* ¶87.) The Secret Service established the boundaries of the Vehicle Screening Perimeter based on technical security assessments related to vehicle-borne threats. (ECF No. 26 ¶22.)

Delegates will be transported to the Convention Venues via a large number of secure buses. (ECF No. 40 ¶91.) Two gravel lots north of the Fiserv Forum, between Juneau Avenue and McKinley Avenue, will serve as the bus depot during the RNC. (*Id.* ¶92.) Buses will enter the Secure Perimeter via Fond du Lac Avenue, a/k/a Highway 145, from the west. (*Id.* ¶93.) Buses will enter the Secure Perimeter via Knapp Street from the east. (*Id.* ¶94.) Delegates arriving by bus will proceed to screening locations on Juneau Avenue. (*Id.* ¶95.) Delegates may also opt to approach the Convention Venues on foot, or via taxi or rideshare from their hotels or other locations in the city. (*Id.* ¶96.) The Secret Service is responsible for ensuring that delegates and those working at the convention are able to safely enter and exit the Secure Perimeter 24 hours a day in planned and emergency situations. (ECF No. 26 ¶24.) For this reason, the Secure Perimeter includes Fond du Lac Avenue, McKinley Avenue, and Knapp Street, to ensure buses may move safely in and out of the Secure Perimeter. (*Id.* ¶18.)

Planners also worked to ensure sufficient, well-placed routes into and out of the Secure Perimeter for emergency responders. (*Id.* ¶25; ECF No. 25 ¶11.) The security plan provides for emergency response vehicles to be staged to the east of the Milwaukee River. (ECF No. 25 ¶12.) Emergency vehicles accessing the Secure Perimeter from the east must cross MLK Drive. (ECF No. 40 ¶97.) MLK Drive is densely populated with bars and restaurants, particularly between State Street and Highland Street, and space for emergency vehicle access is thus limited. (ECF No. 26 ¶28; ECF No. 25 ¶12.) The plan calls for emergency response vehicles to cross the Milwaukee River via State Street, Kilbourn Avenue, and Wells Street. (ECF No. 26 ¶27; ECF No.

25 ¶12.)  These streets must remain free of pedestrian traffic to ensure safe emergency response routes to and from the Convention Venues.  (ECF No. 26 ¶26; ECF No. 25 ¶12.)

The Secret Service and City Officials publicly announced the final security plan at a press conference held on Friday, June 21, 2024.  (ECF No. 40 ¶107.)  The Pedestrian Restricted (Secure) Perimeter and Vehicle Screening Perimeter as established by the Secret Service are reflected in a map prepared by the U.S. Department of Homeland Security.  (*Id.* ¶108; ECF No. 33-2.)  The map also reflects when restrictions will go into effect and shows the locations of vehicle screening points.  (ECF No. 33-2.)  On that same day, City announced plans to provide two speakers podiums with adjacent public viewing areas for listeners and demonstrators, as well as an official parade route.  (ECF No. 27 ¶12; ECF No. 27-3.)

### 5.  THE OFFICIAL PARADE ROUTE, SPEAKER'S PLATFORMS, AND PUBLIC VIEWING AREAS

Official Speaker's Platform time slots will be assigned in 30-minute increments (allowing for 20 minutes of speaking) between 11 a.m. and 7 p.m. during the convention.  (ECF No. 40 ¶116.)  One official Speaker's Platform will be located on the north side of the Convention Venues on MLK Drive, near McKinley Avenue.  (*Id.* ¶111.)  A stage with a microphone and speakers will be provided by the City on MLK Drive, next to Haymarket Square Park.  (*Id.* ¶112.)  This location, the "North Public Viewing Area," is directly adjacent to the Secure Perimeter fence-line, near the delegate bus depot, within sight of the Fiserv Forum and the Deer District Plaza.  (*Id.* ¶113.)  The stage is within 150 feet from the eastern delegate bus lot.  (ECF No. 27 ¶13.)  Delegates arriving by bus will line up for screening on Juneau Avenue before proceeding to the Convention Venues.  (ECF No. 40 ¶114.)  MLK Drive and McKinley Avenue will be closed to vehicle traffic between Vliet Street and McKinley Street.  (*Id.* ¶115.)  Pedestrians may assemble, demonstrate, and move freely between Vliet Street and McKinley Street without any risk of interfering with vehicular traffic.  (ECF No. 27 ¶13.)

A second Speaker's Platform will be located at Zeidler Park with amplified sound in the Park Pavilion.  (ECF No. 40 ¶120.)  Zeidler Park is bounded by Michigan Street on the north, MLK Drive on the east, Everett Street to the south, and Vel R. Phillips Avenue to the west.  (*Id.* ¶121.)  Zeidler Park is one block south and one block east of the Baird Center.  (*Id.* ¶122.)  The City will provide a microphone and speakers for assigned speaker's time slots at the gazebo at Zeidler.  (*Id.* ¶123.)  Pedestrians may assemble, demonstrate, and move freely within Zeidler Park, the "South Public Viewing Area."  (*Id.* ¶124.)

The Official Parade Route begins on the east side of Zeidler Union Square Park and travels east on Michigan Avenue, then north on 2nd Street, east on Wisconsin Avenue, south on Plankinton Avenue, west on Clybourn Street, then north on 5th Street, before crossing near Vel R. Phillips Plaza along the southern fence-line of the Secure Perimeter, and concluding on the west side of Zeidler park.  (*Id.* ¶117.)  Start times on the Official Parade Route will be staggered approximately 20 minutes apart between 11 a.m. and 7 p.m.  (*Id.* ¶118.)  The Official Parade Route approaches within four or five blocks of the Fiserv Forum, and within a few hundred feet of the Baird Center.  (*Id.* ¶119.)

On Friday, June 21, 2024 at 10:45 a.m., the City emailed the Coalition to confirm its registration for a parade slot and to ask the Coalition to indicate any preference between the two Speaker's Platforms by noon on June 26, 2024.  (*Id.* ¶125.)  All applicants with requests pending at the time of the City's email were provided with the same opportunity to indicate a preference between Speaker's Platform locations and to indicate if they were withdrawing their application for either a speaking or parade time slot.  (*Id.* ¶126.)  The City Defendants advised applicants for official parade route and Speaker's Platform registrations that they would be advised of their assigned time slots between 5:00 p.m. on June 26 and July 1, 2024.  (*Id.* ¶127.)  By the close of the registration period, June 30, 2024, the City had received 140 total applications for parade or Speaker's Platform time-slots.  (ECF No. 41 ¶36.)  18 applications were for a parade only, 33 for a Speaker's Platform registration only, and 89 for both a parade and Speaker's Platform registration.  (ECF No. 42 ¶¶10–12.)  No applicants for an Official Parade Route or Official Speaker's Platform time slots have been denied by the City.  (ECF No. 40 ¶158.)

### 6. THE COALITION'S PROTEST PLANS AND PARADE APPLICATIONS

The Coalition plans to hold a protest parade at noon on Monday, July 15, 2024, with plans to stop along the parade route to deliver speeches via amplified sound equipment.  (*Id.* ¶127.)  Persons attending the Convention, along with the persons seeing media coverage of the event, are the intended audience for the public protest, which will be expressed in various ways by the seventy or more organizations and thousands of marchers who make up the Coalition.  (*Id.* ¶128.)

The Coalition has filed a series of applications related to its plans to protest the convention.  On April 12, 2023, Adelana Akindes filed an online application for a special event permit for a demonstration "[b]eginning at Red Arrow Park, south along Water [Street] to Wisconsin [Avenue], west to North 4th Street, north to Wells Street, north to Red Arrow Park," on behalf of Plaintiff.  (*Id.* ¶129.)  The application was filed pursuant to MCO § 105.55-5.  (*Id.* ¶130.)  Plaintiff estimated

500 participants and requested to start at 9 a.m. and end at 9 p.m. (*Id.* ¶131.) The application was denied on the date it was received; the City indicated that such applications could not be accepted more than six months prior to the event date. (*Id.* ¶132.)

On September 21, 2023, city officials received an online application from "FirstName: Coalition to March on the RNC," "LastName: Coalition to March on the RNC," on behalf of "Coalition to March on the RNC." (*Id.* ¶133.) MCO 105-55.5(2)(b1) specifies that applications must include the "name, address, home and business telephone numbers" of the organization's authorized representative "responsible for the conduct of the special event." (*Id.* ¶134.) This application was materially incomplete in that it did not provide required information about the organization's registered agent and, accordingly, was not processed. (*Id.* ¶135.) A response to an applicant is automatically generated only when a completed application is processed. (*Id.*) This application requested a special event permit for a march on "Juneau Ave from North water to 6th, water from state to juneau, state from 6th to water st, and 6th from Juneau to state." (*Id.* ¶136.) The applicant estimated 1,000 participants, and requested to start at 9 a.m. and end at 11 p.m. (*Id.*)

On January 18, 2024, a representative of the Coalition, Omar Flores, filed an online application for a permit to demonstrate, specifying the same route as the Coalition's first application. (*Id.* ¶137.) The Coalition estimated 1,000 participants and requested to start at 10 a.m. and end at 10 p.m. (*Id.* ¶138.) The City responded with an automated email message: "Your Special Event Permit Application has been successfully submitted. If you have any questions, please contact the Special Event Permit Office at (414) 286-3915." (*Id.* ¶139.) Since February 2024, Assistant City Attorney Kathy Block has been in regular contact with Plaintiff's counsel regarding its pending application and other issues related to parade routes and Speaker's Platforms for the convention, as well as prohibited items and the assignments of time slots. (*Id.* ¶140.) On March 13, 2024, Block forwarded a courtesy copy of the draft Special Event Ordinance subsequently adopted by the City Council on March 19, 2024. (*Id.* ¶141.) The Coalition continued to announce in public events, to the press and on social media, that it would be marching in July 2024 at the RNC. (*Id.* ¶142.)

On March 20, 2024, the day after the Special Event Ordinance was passed, Plaintiff's counsel contacted Block to discuss applying for a block of speaker's time-slots. (*Id.* ¶143.) On March 28, 2024, Block left a voicemail for Plaintiff's counsel explaining that Plaintiff's third application was "holding [its] 'place in line'" but that the City expected the Coalition to file an application for an official parade route under the Special Event Ordinance. (*Id.* ¶144.) On April

17, 2024, the Coalition submitted an application for an official parade route through the City's online registration portal. (*Id.* ¶145.) The City acknowledged the application on April 24, 2024. (*Id.* ¶146.) The Coalition requested use of the official parade route from 11 a.m. to 3 p.m. but did not request use of the official Speaker's Platform(s). (*Id.* ¶147.)

Plaintiff's counsel also emailed Block on April 17, 2024, raising objections to aspects of the registration process and reserving the Coalition's right to challenge aspects of the Special Event Ordinance or its application. (*Id.* ¶148.) Plaintiff's counsel also objected to the manner for allocating speaker platform slots and reserved the right to hold rallies inside or outside of the security footprint. (*Id.* ¶149.) Block and Plaintiff's counsel met virtually on April 25, 2024, and discussed how to best secure consecutive time slots for use of the official speaker's podium, when they would know their applications were "accepted," when information about prohibited items would be released, when the official parade route and platform locations would be released, and other topics. (*Id.* ¶150.) Block and Plaintiff's counsel spoke again on May 3, 2024; afterwards Block forwarded requested information. (*Id.* ¶151.) On May 30, 2024, Plaintiff's counsel sent a letter to Mayor Cavalier Johnson and the Commissioner of Public Works depicting its proposed parade route as well as proposed stopping points for speeches and demonstration, including Vel R. Phillips Avenue at McKinley Avenue and MLK Drive at McKinley Avenue. (*Id.* ¶152.) On June 5, 2024, Plaintiff's counsel and Block conferenced again by phone. Plaintiff filed its motion for preliminary injunction later the same day. (*Id.* ¶153.) Following mediation on June 17, 2024, Omar Flores, speaking on behalf of the Coalition, stated "[w]e are going to assert our First Amendment rights, whether or not we have their permission." (ECF No. 29-1 at 5.)

On June 25, 2024, the Coalition issued a press release depicting its updated proposed parade route. (ECF No. 40 ¶154.) The Coalition's originally proposed parade route crosses the Secure Perimeter at several points, making it impossible for the Coalition to parade along its originally proposed route. (*Id.* ¶156.) After release of the credentialed zone map by the Secret Service on June 21, 2024, the Coalition publicly announced an amended route for its march which does not require entry into any of the credentialed zone, with the exception of crossing the credentialed zone corridor at the intersection of Kilbourn and MLK. (*Id.* ¶157; ECF No. 33-4.) The proposed amended parade route begins and ends at Red Arrow Park, (*see* ECF No. 33-4), which the City does not control or have permission to use during the RNC. (ECF No. 27 ¶15.)

On Monday, July 1, 2024, the City sent an email indicating that the Coalition had been granted permit for a parade to start at noon on Monday, July 15th, the opening day of the

convention.  (ECF No. 40 ¶155.)  The permit allows the Coalition to parade and protest along the prescribed Official Parade that will be used by all groups wishing to conduct parades at the RNC. The permit does not, however, allow the Coalition to parade on the route it has demanded. Consistent with the City's prior promises, the Coalition has been given the lead parade spot at the onset of the RNC.

## LEGAL CONCLUSIONS AND ANALYSIS

The Coalition's requested relief has evolved throughout these proceedings, as a result of both changing circumstances and inconsistencies throughout its pleadings and briefing.  At oral argument, Plaintiff's counsel confirmed three specific requests for preliminary injunctive relief:

> (1) an order requiring the City and Secret Service to permit the Coalition to march on Monday, July 15, 2024, along the amended route proposed in its amended complaint and reply brief, (*see* ECF No. 33-4);
>
> (2) an order enjoining the City and Commissioner of Public Works Jerrel Kruschke from denying or revoking parade applications on the basis of prior criminal convictions; and
>
> (3) an order enjoining the City from enforcing its prohibition on parades within the security footprint on grounds that its definition of "parade" is unconstitutionally vague and overbroad.

The Court will treat the pending motion for a preliminary injunction as requesting these three forms of preliminary relief.

## PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (internal quotation marks and citations omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").  A district court considers four factors in weighing whether to enter a preliminary injunction.  As the Supreme Court has explained, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

## I.  The Coalition Has Not Shown that It Is Entitled to an Injunction Allowing It to March on Its Amended Proposed Parade Route.

The Coalition's primary request for injunctive relief relates to its demand that it be allowed to conduct a protest parade on its preferred *amended* route on the first day of the convention.  While

the City has granted the Coalition a permit to parade in protest of the RNC on the requested date and time, the Coalition objects that the City's Official Parade Route is different than the one the Coalition wishes to use. It also contends that the City's route will interfere with Coalition members' ability to express their message[2] to their target audience: "all [p]ersons attending the Convention, along with the persons seeing media coverage of the event." (ECF No. 33 ¶40). The Coalition contends that its proposed route will better allow it to express these views within "sight and sound" of convention attendees.

## A. The Coalition Has Not Carried Its Burden of Showing It Is Likely to Succeed on the Merits of Its Challenge to the Parade Route Restriction.

As an initial matter, there is no question that the First Amendment protects Coalition members' right to express their views concerning the convention and its attendees. Political speech of this type lies at the core of the First Amendment's protections. *Wis. Right to Life, Inc. v. Paradise*, 138 F.3d 1183, 1184 (7th Cir. 1998); *see also Roth v. United States*, 354 U.S. 476, 483–84 (1957) (noting that the First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people"). It is also clear that the Coalition members have the right to express these views both individually and by marching in support of their ideas with like-minded citizens. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 152 (1969) (recognizing that while parading is not "pure speech," the "use of public streets and sidewalks, over which a municipality must rightfully exercise a great deal of control in the interest of traffic regulation and public safety, . . . the First and Fourteenth Amendments [] afford [some] . . . freedom to those who would communicate ideas by conduct such as patrolling, marching and picketing"). There is an "inherent expressiveness [in] marching to make a point." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 568 (1995).

At the same time, it is equally without question that the Coalition members' right to express themselves is not a license to do so in any way they choose, without regard to the rights of others or to legitimate public interests. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) ("[T]he First Amendment does not guarantee the right to communicate one's views at all time and places or in any manner that may be desired."); *MacDonald v. City of Chicago*, 243 F.3d 1021, 1025 (7th Cir. 2001) ("Although [plaintiff] has the right to demonstrate

---

[2] According to its press releases, the Coalition's messages are united around three principles: "*1) Fight the racist and reactionary Republican agenda!"; "2) Abortion access now!"; and "3) Peace, justice, and equality for all!"* (ECF No. 3-6 at 4.)

and speak freely on this issue, that right does not allow him and other participants to create chaos by disrupting traffic, impeding pedestrians, endangering themselves or other people, and otherwise causing gridlock on the busy streets and sidewalks of the city."). The First Amendment is not offended by reasonable restrictions on the time, place, and manner of an individual's exercise of his or her First Amendment rights. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791, 803 (1989) (upholding New York City regulations on protests in Central Park)*; Frisby v. Schultz*, 487 U.S. 474, 487–88 (1988) (upholding City of Brookfield municipal ordinance prohibiting picketing targeting particular residences). Reasonable time, place, and manner restrictions can include permitting schemes that limit expression in public places. *See Navratil v. City of Racine*, 101 F.4th 511, 519–21 (2024).

Central to the Coalition's request for injunctive relief is the Coalition's contention that the City's enforcement of its Special Event Ordinance and refusal to allow the Coalition members to parade on their preferred route are not reasonable time, place, and manner restrictions and are therefore unconstitutional prior restraints on speech. The Coalition thus contends it is likely to succeed on the merits of its First Amendment challenge. It also argues that the other preliminary injunction factors weigh in favor of granting its requested relief.

### 1. The Special Event Ordinance, Including the Prescribed Official Parade Route, Is a Reasonable Time, Place, and Manner Regulation.

The Supreme Court discussed the basic legal framework applicable to time, place, and manner restrictions in *Ward*. In that case, the Court addressed restrictions governing the use of a bandshell located in the southeast corner of Central Park. 491 U.S. at 784. The plaintiff had a history of using the bandshell for an annual program of speeches and "rock music" to promote "antiracist" views. *Id*. In response to complaints from other park users and residents about excessive noise, the City of New York adopted guidelines to regulate the volume of amplified music emanating from the bandshell, with the goal of doing so in a way that ensured performances were satisfactory to stage users while also protecting nearby residents and users of more serene areas in the park. *Id*. at 784–87. The Supreme Court upheld the regulation but confirmed the importance of protecting the freedom of expression of bandshell users and event organizers. *Id*. at 790–803. The Court also acknowledged that the park and bandshell were traditional public fora, but then explained that "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a

significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Id.* at 791 (quoting *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293 (1984)).

Under *Ward*, a proposed time, place, manner restriction is constitutional if it is: (1) content neutral; (2) narrowly tailored to serve a significant governmental interest; and (3) leaves open ample alternative channels for communication. *See Marcavage v. City of Chicago*, 659 F.3d 626, 630 (7th Cir. 2011). The Coalition argues that Defendants' restrictions fail to satisfy each of these elements.

### a. The Special Event Ordinance and Prescribed Parade Route Are Content Neutral Regulations.

An ordinance is content neutral "so long as it is '*justified* without reference to the content of the regulated speech.'" *Ward*, 491 U.S. at 791 (emphasis in original) (quoting *Clark*, 468 U.S. at 293). The principal issue in making this determination "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* (quoting *Clark,* 468 U.S. at 295). Thus, the "government's *purpose* is the controlling consideration." *Id.* (emphasis added). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.*

As the Coalition conceded at oral argument, the City's Special Event Ordinance and parade regulation are content neutral on their face. Under the Special Event Ordinance, all protestors who wish to parade in protest of the convention were required to apply for a permit and reserve a spot in the procession. (ECF No. 7-6, §§ 6, 12.) Likewise, all protestors must use the same Official Parade Route, irrespective of the message they seek to convey. While the City will stagger start times approximately 20 minutes apart for all participants, beginning at 12 p.m. and continuing to 7 p.m. on the first day of the convention, the Coalition has not suggested that the City is using the content of any participant's messaging in determining their start time. These regulations apply uniformly to all would-be protestors who seek to parade, regardless of the content of their message, presumably including anyone seeking to march in support of the convention. Accordingly, nothing in the application process or the substance of the ordinance suggests any test based on the content of an applicant's message. In sum, the Coalition is not being singled out in any way based on its members' speech or expressive activity.

This does not end the analysis, however. "If there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction . . . that restriction may be content based." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022). The Coalition has not presented any credible evidence that the City had an impermissible purpose in enacting the Special Event Ordinance or adopting the Official Parade Route.

The best the Coalition can muster is correspondence from the RNC's counsel to the Secret Service earlier this year, lobbying for a change to the preliminary security footprint. In the preliminary security plan, the Secret Service contemplated designating Pere Marquette Park, between the Milwaukee River and several convention venues, as a "First Amendment" zone for protesting. The RNC's counsel argued that the Secret Service should move the protest zone out of the park and further from the Convention Venues because of security concerns. (ECF No. 33-1.) Several months later, when the Secret Service announced the final security footprint, it did not designate Pere Marquette Park as a protest zone. In fact, the park is now included within the more protected Secure Perimeter, access to which will be limited to credentialed persons. This change resulted in the Coalition's (subsequently announced) amended parade route actually crossing through the Secure Perimeter. Because these changes followed RNC counsel's lobbying, the Coalition asks to infer a content-based restriction in the Special Event Ordinance and Official Parade Route and impute to the City an intent that is hostile to the Coalition's message. The Coalition contends it is "transparently obvious" that the content of the Coalition's speech drove the City and Secret Service to adjust the security footprint and, in turn, to reject the Coalition's proposed amended parade route.

The Coalition's content neutrality challenge fails for several reasons. As an initial matter, the Coalition misunderstands the legal test. Under *Ward*, content neutrality turns on *the City's* and *Secret Service's* intentions and purpose. *See* 491 U.S. at 791. There is no evidence, beyond the Coalition's speculative assertions, that anyone at the City or the Secret Service has any antipathy toward the Coalition or its message. Indeed, the record shows the opposite. The City has worked extensively to ensure Coalition members are able to express themselves consistent with the First Amendment. Even as the Coalition filed a series of premature and defective permit applications, the City remained in regular contact with the Coalition, discussing the City's regulations, providing a courtesy copy of the Special Event Ordinance before it was adopted, and agreeing to "hold" the Coalition's place in line, in effect giving the Coalition the lead role in the protest parade set for the opening day of the convention, on the time and date the Coalition had requested. The Court finds

that neither the City nor the Secret Service has shown any hostile intent toward the Coalition or its members' messages.

The Coalition's argument also ignores the factual record. The City and Secret Service have explained that, after the initial security footprint was announced, the RNC Committee on Arrangements added the Milwaukee County Historical Society adjacent to Pere Marquette Park as a Convention Venue. It also informed the Secret Service that one or more individuals subject to the Secret Service's statutory protection obligations would be attending events at that location. As counsel for the Secret Service explained at oral argument, the addition of this venue necessitated revisions to the original security footprint. If the security footprint had not been revised, attendees traveling to the new venue would have been required to leave an area they had already been screened to enter and then be rescreened to enter the Milwaukee County Historical Society. And when they left that building to return to the other venues, they would need to be rescreened again. By adjusting the Secure Perimeter to encompass the new venue, the Secret Service avoided a major logistical mess and saved substantial costs. These are obvious content-neutral justifications for the decision to change the final security footprint.

To the extent the Coalition suggests the City and Secret Service should have rejected the Committee on Arrangement's addition of the Milwaukee County Historical Society as a venue, the Coalition misunderstands the players' roles. The convention is an event organized and conducted by the Republican National Committee and its Committee on Arrangements, which consist of groups of private citizens, not government actors. It is the Committee on Arrangements that decides what, where, and when convention events will occur, not the City and not the Secret Service. Even the Convention Venues themselves are privately-owned facilities. The City and Secret Service are simply working to provide appropriate security needs and to protect other public interests based on the venues and events planned by those private entities. That the Committee on Arrangements made a change to the Convention Venues cannot be used to impute a sinister or unconstitutional motive to the City or Secret Service.[3]

The Coalition's suggestion that Defendants enacted changes to the security perimeter to thwart the Coalition's preferred parade route also fails based on simple timing. The Coalition announced its first preferred parade route in its April 12, 2023 permit application. That route

---

[3] The Coalition and its counsel, the ACLU of Wisconsin Foundation, should also appreciate that the RNC had a First Amendment right to lobby the government for its perceived security needs. *See Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 22–29 (1989) (discussing First Amendment rights of political parties). That First Amendment right is entitled to the same respect as the Coalition's right to express its views about the RNC.

called for a march south down Water Street, then west along Wisconsin Ave and Wells St, north up N. 6th St, east along Juneau Ave, and south back down Water Street to Red Arrow Park. (ECF No. 33-1.) It did *not* include a march down MLK Drive or anywhere adjacent to the Milwaukee Historical Society building. It was only later—*after* the Secret Service had announced the final security footprint—that the Coalition announced its latest, revised route, which now includes a march down MLK Drive and past the Milwaukee Historical Society building. Accordingly, the Secret Service did not know when it changed the final security footprint that the Coalition would announce a new parade route and could not have intended to obstruct the Coalition's amended route. In sum, the Court finds there is no credible evidence that the Secret Service or City had any disagreement with the Coalition's message or any intention to impede that message in enacting the Special Event Ordinance and Official Parade Route. The challenged regulations are content neutral.

### b. The Challenged Restrictions Are Narrowly Tailored to Serve Significant Governmental Interests.

A valid time, place, and manner regulation must also be narrowly tailored to serve significant governmental interests. *Ward*, 491 U.S. at 791. Importantly, this does not mean that the regulation must be the "least restrictive or least intrusive means" of achieving the government's content-neutral goals. *Id.* at 798. The government must simply establish that the restriction "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 799 (quoting *United States v. Albertini,* 472 U.S. 675, 689 (1985)). Accordingly, a time, place, or manner regulation is valid so long as it does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* (citing *Frisby,* 487 U.S. at 485 ("A complete ban can be narrowly tailored but only if each activity within the proscription's scope is an appropriately targeted evil.")). The Supreme Court has also specifically warned that courts should not insert themselves into regulatory judgments more appropriately made by the states and political branches of government. Thus, as long as the means chosen for the regulation "are not substantially broader than necessary to achieve the government's interest," a court should not strike down a regulation "simply because [the] court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800.

The Coalition concedes that safety and security concerns are significant government interests. This much is uncontroversial. Courts have long acknowledged the significant interests

state and local governments have in ensuring public safety. *See Navratil*, 101 F.4th at 520 ("The Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States to guard and protect.") (internal quotation marks and alterations omitted). Significant government interests also include controlling traffic congestion and the orderly flow of traffic. *See McCullen v. Coakley*, 573 U.S. 464, 487 (2014) ("We have, moreover, previously recognized the legitimacy of the government's interest in 'ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, [and] protecting property rights.'") (quoting *Schenck v. Pro-Choice Network of W.N.Y.*, 519 U.S. 357, 376 (1997)); *MacDonald*, 243 F.3d at 1025; *Marcavage*, 659 F.3d at 631. Defendants explain their efforts to address all of these interests in the restrictions at issue here. The Coalition nevertheless insists the City has offered only "blanket invocations" to support its efforts to satisfy these interests. It also offers a number of critiques of the security plan and contends the flaws it has identified show the restrictions are not narrowly tailored to achieving the City's professed interests.

Contrary to the Coalition's suggestion, the record contains ample evidentiary support for Defendant's adoption of the overall convention security plan and the Special Event Ordinance. Defendants have come forward with multiple declarations under penalty of perjury explaining security planners' efforts to keep the convention attendees, public employees, vendors, and city residents safe and secure. Those efforts were informed by law enforcement professionals, including Secret Service Special Agent Audrey Gibson Cicchino and Milwaukee Police Captain Timothy Gurkee, along with other experts in public health and safety, emergency and disaster response, and traffic flow. The Secret Service has detailed its role in planning, coordinating, and implementing security operations at special events of national significance, including the convention, and its statutory responsibility to protect former Presidents and Vice Presidents, their spouses, as well as major party Presidential and Vice Presidential candidates in the time leading up to an election. The Secret Service's efforts specifically accounted for numerous potential security threats including: terrorist attacks, lone gunmen, fire, environmental hazards, chemical or biological attacks, structural safety concerns, vehicle attacks, and suicide bombers.

Defendants explain that they expect more than 50,000 delegates, staff, visitors, press, and law enforcement personnel to attend the convention. They confirm their intentions to preserve the First Amendment rights of protesters while also taking into account the need to preserve public safety, the needs of residents and businesses in the vicinity, traffic flow and transportation needs, and on-going law enforcement needs unrelated to the convention. To achieve these goals, the

security plan includes the creation of the "Secure Perimeter," which has been designed based on technical assessments and evaluations that included consideration of the risk of person-borne explosives, the physical features and elevations of the Convention Venues, the effective range of weapons, and emergency ingress and egress routes, all in downtown Milwaukee, at venues in close proximity to the Interstate to the west and the Milwaukee River to the east. The Secure Perimeter will be closed to vehicles and pedestrians and surrounded by a non-opaque security fencing and other barriers, with access limited to credentialed persons entering only at designated access points through a magnetometer or similar device. The security plan also includes a Vehicle Screening Perimeter, slightly broader than the Secure Perimeter, which will be open to pedestrians but with limited access for vehicular traffic. Drivers may access this area but only through designated vehicle screening points. The Secret Service established the boundaries for the Vehicle Screening Perimeter based again on technical security assessments related to vehicle-borne threats.

This limited security zone is a far cry from the crudely designed security perimeter that was proposed (and ultimately subject to a preliminary injunction) in connection with the 2000 Democratic National Convention in *Service Employee International Union v. City of Los Angeles*, 114 F. Supp. 2d 966, 969 (C.D. Cal. 2000). In that case, the Secret Service and Los Angeles Police Department designated a massive *185 acre* area surrounding the Staples Center as a "secured zone." *Id*. at 971. The district court granted a preliminary injunction, finding that this massive secured zone was not narrowly tailored. *Id*. at 974–75. Here, in contrast, the Secure Perimeter is ultimately a small area in a limited part of Milwaukee's downtown west of the Milwaukee River. While the Vehicle Screening Perimeter is larger, Defendants have explained the need to control vehicle entry and exit for security and traffic control purposes.

The Coalition nevertheless critiques Defendants' security plan as not being narrowly tailored to achieve the security, public safety, and traffic control interests identified by Defendants. In its briefing and at oral argument, the Coalition chastises Defendants for their "octopus-shaped" Secure Perimeter. While the Court is not sure it can make out an octopus in the contours of the designated area, it agrees with Defendants that this disparagement is misplaced. In fact, the odd shape of the Secure Perimeter shows Defendants' efforts to draw the secured area narrowly, to keep it as close as possible to the Convention Venues and the entry and exit points. It would have been much easier to draw a rectangle that encompassed all venues. Defendants' eschewing of that easier approach supports a finding that the security zone is narrowly tailored.

The Coalition's primary substantive complaint is that the Official Parade Route will not allow them to express themselves immediately in front of or behind the Fiserv Forum. The Coalition's initial parade route had its members marching directly adjacent to the north and west sides of the arena. Its amended parade route turns down MLK Drive, one block east of the arena. It prefers these routes because they will allow its members to express their opposition messages within "sight and sound" of convention attendees. The Official Parade Route, on the other hand, consists of a loop that goes no farther north than Wisconsin Avenue. While the prescribed route comes within a block of the Baird Center, another of the main Convention Venues, the Coalition complains it prefers to have its members protest closer to the Fiserv Forum. The Coalition explains that the Fiserv Forum is where the actual nomination of the Republican Party's presidential candidate will take place (although not during the parade) and thus it is of symbolic importance.

This critique does not support a finding that the overall convention security plan, the Special Event Ordinance, or the Official Parade Route are not narrowly tailored. Coalition members do not have a First Amendment right to express themselves at all places and times of their choosing. *See Heffron*, 452 U.S. at 647. That the City's Official Parade Route and the Coalition's preferred route are not the same does not render the official route constitutionally inadequate. *See Marcavage*, 659 F.3d at 631. As the Supreme Court explained in *Ward*, a regulation is narrowly tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regulation." 491 U.S. at 799 (quoting *Albertini,* 472 U.S. at 689). Defendants have shown that limiting protesters who wish to march on the convention to the Official Parade Route is narrowly tailored to achieve their goals of providing security for the event, maintaining emergency access to and from the convention venues, and avoiding traffic congestion in the confined streets of downtown Milwaukee. Defendants have demonstrated that the Coalition's proposed amended parade route undermines these significant governmental interests. The Coalition's route includes a march down Water Street, a primary north/south corridor used by downtown employees and residents. It is the main north/south thoroughfare east of the Milwaukee River, where the City's primary commercial office buildings are located. Defendants explain that a parade up that street would block traffic on that key street, threatening major traffic congestion. Defendants also explain that a parade marching up Water Street would cross and thus block the entry and exit routes into the Secure Perimeter. The City has a significant government interest in keeping those routes free of congestion and clear for emergency responders and evacuation plans in case emergency services are needed during the convention.

Other than its ethereal complaint that its members would prefer to express their dissatisfaction with convention attendees near the Fiserv Forum, the Coalition has not come forward with evidence of any substantial burden on its members' First Amendment rights. Nor has the Coalition offered any evidence, by expert testimony or otherwise, supporting a finding that a protest parade could be conducted at a different location, including one of the Coalition's proposed routes, without sacrificing the legitimate government interests Defendants have identified. At most, the Coalition argues that the City is being overly cautious and that a single parade for a short period of time on a single day is not cause for concern. It argues that the City can sacrifice traffic on Water Street for the time necessary for the parade to be conducted and that police and parade marshals will be able to halt the parade and clear any intersections if there is a need for emergency vehicles to enter or exit the Secure Perimeter, even if the parade blocks those emergency routes.

This attempt to minimize the risks Defendants are attempting to manage is unhelpful and ignores the likely extent of the protest parade. According to the Coalition, its own members will likely include as many as 5,000 marchers. And the Coalition members are not the only individuals planning to protest. In analyzing the restriction, the Court must account for the fact that other protesters would likely seek to be treated the same as the Coalition. *See Clark*, 468 U.S. at 296–97 (explaining that evaluating validity of permit restriction on construction of tents in public park as time, place, and manner regulation required accounting for other groups' requests for similar treatment). The City reports that it has received 140 applications for protest permits, 18 of which requested a parade permit only, 33 requested a Speaker's Platform registration only, and 89 sought both a parade time-slot and a speaker's timeslot. (ECF No. 42 at 2.) Accordingly, in addition to the Coalition members, the City will have to deal with another 106 more individuals or groups (of unknown size) who also wish to march on the parade route in protest. Added to the Coalition's own members, this is hardly a small group that can readily be controlled or moved, as the Coalition suggests. Getting that many protestors on and off Water Street or clearing them from one of the key intersections in an emergency is not an obviously simple or quickly accomplished task. This is not a risk the Court is willing to impose upon downtown residents, law enforcement personnel, or convention workers and attendees.

In the end, the Court finds that Defendants have come forward with convincing evidence that they have narrowly tailored the restrictions on First Amendment activity to achieve substantial governmental interests. The Coalition's arguments to the contrary are unsupported by evidence

and simply invite the Court to substitute its own judgment for that of the security experts, an exercise the Supreme Court has expressly cautioned against. *Ward*, 491 U.S. at 797–98. It is not for this Court to agree or disagree "with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests" or the degree to which those interests should be promoted. *Id*. at 799 (quoting *Albertini*, 472 U.S. at 689). The Secret Service and the City have shown they are responsible decisionmakers and the Court will not second guess their judgments, particularly with respect to complex issues like the security needs for a large convention.

### c. The City's Security Plan Leaves Open Ample Options for Coalition Members to Express Their Views.

A valid time, place, and manner regulation must also leave speakers ample opportunities to express their views. *Ward*, 491 U.S. at 802. The Coalition's sole argument is that the Official Parade Route does not provide it with an ample opportunity to express its views compared to the Coalition's preferred amended parade route. This argument largely repeats the Coalition's complaint, which the Court has already addressed, that the regulations are not narrowly tailored because they do not allow it to express its views on its preferred route, closer to the Fiserv Forum.

The Supreme Court and Seventh Circuit do not define ample options to mean that speakers must be allowed to express themselves at their preferred location. To the contrary, "[a]n adequate alternative does not have to be the speaker's first choice." *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002) (citing *Heffron*, 452 U.S. at 647.) The First Amendment simply requires that the restriction allow the speaker sufficient other opportunities to communicate its message. That requirement is satisfied here. Under the City's regulations and security plan, the Coalition's members are free to express themselves in multiple alternate ways. They can march in a protest parade on the Official Parade Route. That route passes within one block of the Baird Center, one of the primary venues for the convention and, in fact, the primary location for the media. This cuts against the Coalition's complaint that it will be impaired in disseminating its members' messages. The City's regulations also leave the coalition members free to express their message at one of the two Official Speaker's Platforms and two Public Viewing Areas. The Speaker's Platform on MLK Drive and the North Public Viewing Area are both within close proximity to the Fiserv Forum and to the bus loading and unloading zones. Coalition members can also stand, march, or protest throughout much of the area if they do not interfere with traffic or the Official Parade Route.

The Coalition insists it is being prevented from expressing its views to convention attendees. The record refutes this contention. To the extent Coalition members feel it important to protest within earshot of convention attendees, they are free to do so at the Speaker's Platform on MLK Drive and the North Public Viewing Area, both of which are proximate to convention attendees as they arrive and depart. As a practical matter, that approach seems more likely to result in attendees actually hearing the Coalition members. Anyone who has attended a Milwaukee Bucks game in the Fiserv Forum can confirm that the building is sufficiently soundproof that those inside cannot hear what is going on outside the arena. Moreover, Coalition members can express their messages at Speaker's Platforms and Viewing Areas *every day of the convention* rather than just one time during the parade. The Speaker's Platform at Zeidler Union Square Park and the South Public Viewing area are close to the Baird Center and to the hordes of media personnel who will be in attendance—again providing speakers with an opportunity to share their messages with journalists. The record does not support a finding that the Coalition members will not have ample alternative venues to express their messages.

### 2. The City's Special Event Ordinance Is Not an Unconstitutional Prior Restraint.

While the Coalition did not emphasize this contention at oral argument and may have abandoned it, its briefing also maintains that the City's permit requirement and designation of an Official Parade Route constitute unlawful prior restraints on Coalition members' free speech rights. This argument fails under Seventh Circuit law. Moreover, even if the permit requirement could be deemed a prior restraint, the Court's finding that the City's regulations constitute reasonable time, place and manner restrictions defeats any claim for injunctive relief on this ground.

The Seventh Circuit wrestled with the somewhat confusing caselaw governing whether a permitting regulation scheme should be analyzed under the time, place, and manner regimen or as a prior restraint on speech in *Thomas v. Chicago Park District*, 227 F.3d 921 (7th Cir. 2000) and *MacDonald v. City of Chicago*, 243 F.3d 1021 (7th Cir. 2001). In *MacDonald*, the Court of Appeals explained that a regulatory scheme that conditions an individual's right to speak on the receipt of a permit from a government agent who has unbridled discretion to grant or deny the permit is an unconstitutional prior restraint. 243 F.3d at 1026-27. But the government may impose permit requirements on those wishing to hold a march, parade or rally, if the discretion granted is properly limited and the regulation otherwise satisfies the requirements of a reasonable and content neutral time, place and manner regulation. *Id*.; *see also GEFT Outdoor, LLC v. Monroe County*,

62 F.4th 321, 327 (7th Cir. 2023) ("[P]rior restraints are constitutionally sound time, place, or manner restrictions as long as they are content neutral, are narrowly tailored to serve a significant government interest, leave open alternative avenues for speech, and do not put too much discretion in the hands of government officials.") (citing *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992)).

The City's Special Event Ordinance falls into the latter category. While permits are required to march on the City streets in protest of the convention or to secure a spot on one of the speakers' platforms, the ordinance does not give City bureaucrats overly broad or unbridled discretion to grant or deny a permit. City officials only have authority to deny or revoke a permit in three situations: (1) a false or incomplete statement made in the permit application; (2) violation of the Special Event Ordinance; and (3) upon a finding by the Commissioner of Public Works that an individual associated with the applicant has been convicted of a violent or destructive offense relating to a parade or protest. As discussed below, the third grant of discretion to the Commissioner of Public Works is an unconstitutional prior restraint, and the Coalition's request for preliminary injunctive relief will be granted as to that provision. But that provision is severable from the rest of the ordinance and does not otherwise render the City's permitting process a prior restraint. And, as discussed above, there is no evidence suggestion that the granting or denial of a permit will otherwise be content-based—the permitting process is a reasonable time, place and manner regulation.

To be clear, if the City were to deny a permit based on the content of an applicant's speech, that action would violate the First Amendment and the ordinance would be unconstitutional as applied. Should that occur, the aggrieved party would be able to seek relief on an as-applied basis. But on its face, the Special Event Ordinance and its permit requirements pass constitutional muster and its grant to the Coalition of a permit to parade only on the Official Parade Route is equally lawful.

## B. The Coalition Has Not Shown that the Remaining Factors Warrant Entry of Injunctive Relief.

As detailed above, the record establishes that the Coalition is not likely to succeed on its claim that Defendants' security restrictions violate the Coalition members' First Amendment rights. To the contrary, the Court finds that the Special Event Ordinance and Official Parade Route are valid time, place, and manner restrictions. This finding largely moots any consideration of the other three preliminary injunction factors. For the avoidance of doubt, to the extent these other

considerations remain relevant, the Court finds that none of them, even collectively, warrant entry of a preliminary injunction.

With respect to the harm to the Coalition if an injunction is not issued, the Court acknowledges that Coalition members would be in a better position to express themselves as they prefer if an injunction were issued. But, as discussed above, the First Amendment does not guarantee a speaker the right to express himself or herself at all places and times of their choosing. *See Heffron*, 452 U.S. at 647. Even without a preliminary injunction, Coalition members will be able to express their intended messages. They will also be able to parade in protest of the RNC at the very date and time they have requested. They simply will not be able to do so on the precise route they prefer. The Court finds that this is not a significant imposition and weighs against granting injunctive relief.

In contrast, the consequences to Defendants of entering the preliminary injunction the Coalition requests are more substantial. An order requiring Defendants to allow the Coalition to march on its preferred route would require substantial changes to the security plan. The Coalition's route involves a march down MLK Drive and would violate the integrity of the Secure Perimeter. The parade would cross an area within the Secure Perimeter that connects the Milwaukee County Historical Society with the other main Convention Venues. As Defendants have explained, entry into (or walking through) an area within the Secure Perimeter is limited to credentialed visitors (generally venue employees or convention attendees) who have been subject to screening, including passing through a magnetometer. The Coalition's requested injunction would require significant changes to these plans, perhaps including the acquisition of additional screening staff and equipment. Such changes also threaten to undermine the Secret Service's statutory obligation to protect certain convention attendees. Moreover, the Coalition's amended parade routes includes a procession down Water Street, the primary north/south thoroughfare east of the Milwaukee River. Ordering the City to allow the Coalition to parade up that street would likely increase traffic congestion and block all three of the planned emergency entry and exit routes into the Secure Perimeter.

The public interest also weighs against entering a preliminary injunction. The City has identified a number of significant government interests that the Special Event Ordinance is intended to advance. The Coalition's desire to march on its preferred right does not trump these public goals.

## II. The Coalition's Requests to Enjoin the City from Enforcing Specific Portions of the Special Event Ordinance Will be Granted, but Only in Part.

The Coalition's second and third requests for injunctive relief are based on facial challenges to two more specific aspects of the City's Special Event Ordinance. The Coalition asks the Court to enjoin the City from enforcing parts of the ordinance that would: (1) allow it to revoke parade or protest permits from participants found to have been previously convicted of engaging in violent protest; and (2) prohibit protest "parades" other than those taking place with a City permit at the time and place the City has prescribed. As to the first request, the Coalition contends the denial or revocation of permits from protestors based on their mere association with others who have (even seven-year-old) prior criminal convictions violates the First Amendment. With respect to the second, the Coalition argues that the prohibition violates Due Process because the statutory definition of "parades" is vague and overbroad. Because the first position has support in Seventh Circuit law, the Court will grant the requested preliminary injunction. The Coalition's final request will be denied, however; the ordinance's prohibition on parades within the security footprint is neither unconstitutionally vague nor overbroad.

### A. The Special Event Ordinance's Prohibition on Protesting Based on Non-Recent Criminal Convictions Is an Overly Broad and Unconstitutional Prior Restraint on First Amendment Speech.

At oral argument, the Coalition explained that its second request for injunctive relief is related to provisions in the Special Event Ordinance giving the City's Commissioner of Public Works, Defendant Kruschke, authority to deny or revoke permits from applicants convicted of crimes.[4] In particular, subsection 9a-2 provides that City officials may deny or revoke a permit upon:

> "A determination by the Commissioner of the Department of Public Works that an applicant, or persons represented by the applicant, have previously engaged in violent or destructive conduct in connection with a previous parade or other public assembly, in violation of any provisions of the Milwaukee Code of Ordinances or any state or federal laws."

---

[4] The parties' briefing on this issue is underdeveloped. Indeed, the Coalition's initial and amended complaints do not refer to Section 9a-2 or its contents. The Coalition's preliminary injunction motion is also silent on this provision. The Coalition does not address the commissioner's authority to deny or revoke permits under Section 9a-2 until its reply brief. (*See* ECF No. 34 at 22.) That said, Defendants made no objection at oral argument and proceeded to offer arguments on the merits against the relief requested. Accordingly, the Court will address this form of requested relief on the merits.

(ECF No. 7-6, § 9a-2.)  Commissioner Kruschke has since provided further guidance that any denial or revocation of a permit pursuant to subsection 9a-2:

> "[S]hall be based upon a finding that the applicant, or persons represented by the applicant, have been convicted or adjudicated guilty of engaging in violent or destructive conduct in connection with a previous parade or other public assembly in violation of the Milwaukee Code of Ordinances or any state or federal laws within the last 7 years."

(ECF No. 28 ¶12.)

### 1.  The Coalition is Likely to Succeed on the Merits.

The Coalition argues that subsection 9a-2 of the Special Event Ordinance vests Commissioner Kruschke with unconstitutional authority to restrict the First Amendment rights of persons convicted of crimes and of members of the groups with which they associate.  It maintains that subsection 9a-2 "is facially unconstitutional as an impermissible prior restraint of protected First Amendment activity."  (ECF No. 34 at 23.)

A statute or ordinance may be held facially invalid when (1) it "could never be applied in a valid manner" or (2) it is substantially overbroad, thus having "the potential to repeatedly chill the exercise of expressive activity by many individuals."  *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 797–801 (1984) (quoting *New York v. Ferber*, 458 U.S. 747, 772 (1982)).  While the overbreadth doctrine is generally employed "only as a last resort," doing so is appropriate when an ordinance "prohibits a substantial amount of protected speech" in relation to its lawful applications.  *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 476 (7th Cir. 2012)  (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008); *Ferber*, 458 U.S. at 769.

"[A] prior restraint exists when a regulation '[gives] public officials the power to deny use of a forum in advance of actual expression.'"  *Stokes v. City of Madison*, 930 F.2d 1163, 1168 (7th Cir. 1991) (quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975)) (alteration in original).  While not necessarily unconstitutional, prior restraints are "[s]trongly disfavored as a means of speech regulation."  *Id.*  Thus, a prior restraint faces "a heavy presumption against its constitutional validity.  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).  A narrowly drawn prior restraint may be constitutional only if it is justified by a "powerful overriding interest," such as national security, incitements to violence, or the overthrow of orderly government.  *Stokes*, 930 F.2d at 1169 (citing *Near v. Minnesota*, 283 U.S. 697, 716 (1931)).  The Supreme Court has also permitted prior restraints "where procedural safeguards tightly control the discretion of the

administrative authority and subject it to rapid judicial review." *Id.* (citing *Conrad*, 420 U.S. at 560).

In *Collin v. Chicago Park District*, 460 F.2d 746 (7th Cir. 1972), the Seventh Circuit considered the Chicago Park District's denial of a permit application by the leader of the Nazi Party of America to hold a rally in a city park. In upholding the permit denial, the district court stated that "prior meetings have been attended by violence almost without fail, and the activities of the organization seem to be dedicated to violent acts of one sort or another." *Id.* at 750. The Seventh Circuit reversed, concluding in part that the available evidence of violence was insufficient to justify abridging the plaintiff's First Amendment rights. The Court of Appeals held that "in order to sustain a prior restraint on speech the Park District had to sustain the heavy burden that 'incitement to imminent lawless action' would in fact take place and that there existed a high probability that this incitement would be effective." *Id.* at 753 (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969)). Because the Park District "could cite only scattered instances of violence from a period more than one year prior to the present application," its prior restraint of the plaintiff's speech was unconstitutional. *Id.* at 754. While the Court did not establish the precise frequency or temporal proximity of past violent behavior that might justify denial of a permit, it made clear that scattered instances of violence from more than a year prior are insufficient.

*Collin* makes clear that even a "powerful overriding interest" such as curtailing incitements to violence, *see Stokes*, 930 F.2d at 1169, does not justify a sweeping prior restraint of expressive conduct on the basis of past violence. Subsection 9a-2 flatly violates this rule, allowing the commissioner to revoke a parade or speaker permit *for an entire group* if a single person merely associated with that group has been convicted of a single ordinance violation or crime relating to a parade or public assembly *within the last seven years*. The ability to deny a group of individuals their First Amendment right to express themselves under subsection 9a-2 goes far beyond what the Constitution permits. It also creates a significant risk of censorship exceeding that necessary to prevent "incitement to imminent lawless action," the limited circumstance in which a permit could be denied under Seventh Circuit law. While a more narrowly tailored regulation could conceivably be applied in a constitutional manner, as currently constructed, including with commissioner's latest guidance, subsection 9a-2 is an unconstitutionally overbroad prior restraint under the First Amendment.

The Court finds that the Coalition has established a strong likelihood of success on the merits with respect to this request for injunctive relief.

## 2. The Remaining Preliminary Injunction Factors Weigh in Favor of Granting Relief.

The loss of First Amendment rights "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1974) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)). No monetary award or other legal relief could adequately compensate the Coalition (or any other permit applicant) if they are unconstitutionally denied the right to march or speak at the convention. And unlike the reasonable time, place, and manner restrictions discussed above, subsection 9a-2 vests the City with discretion to censor expressive activity entirely on all official channels the ordinance provides for expression. Less clear, however, is whether the Coalition (or any other applicant) is likely to suffer that irreparable injury. As the City's counsel explained at oral argument, Section 9a-2 has not (yet) been employed to deny or revoke any permit applications. In fact, there is no evidence that the City has, to date, denied any applications for parades or Speaker's Platform slots for *any* reason. But the commissioner's present failure to exercise this discretion under subsection 9a-2 is unsurprising given the transitory nature of the ordinance, which has only just come into effect. Further, the overbreadth doctrine is concerned with the "the potential to repeatedly chill the exercise of expressive activity by many individuals." *Ferber*, 458 U.S. at 772. Whether the commissioner exercises his discretion under subsection 9a-2 or not, its very existence creates the risk that groups will restrain the expressive conduct of any of their own members with applicable prior convictions rather than risk revocation of their permits.

The balance of equities tilts in favor of the Coalition. If the Coalition or any other group has its permit registration revoked, it will suffer an irreparable injury of constitutional magnitude. And that injury will extend to members of the group, possibly numbering in the thousands, that have no connection to the violent offense that leads to the revocation. Such harm would be considerable. The City has argued without much vigor or evidence that it might not have sufficient police staffing to maintain the official parade route without subsection 9a-2. Given the City's concession that it has not yet denied any applications based on this ground, this argument is speculative. And other evidence cuts against it. The parties stipulated that as many as 4,500 police officers are being brought in from outside Milwaukee to staff the convention. And this entire case centers around the comprehensive security plan the Secret Service and MPD have developed to deal with any threats that might develop during the convention. Absent more concrete evidence to support the City's speculation, the Court cannot conclude that the City will be somehow be unequipped to handle protests simply because one or more of the individuals demonstrating may

have been involved in violent or destructive behavior at a prior demonstration within the last seven years.

The public interest also favors enjoining the provision. "[U]nconstitutional restrictions on speech are generally understood not to be in the public interest and to inflict irreparable harm that exceeds any harm an injunction would cause." *Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 286 (7th Cir. 2014) (citing *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012)). While curtailing incitements to violence is undoubtedly also within the public's interest, subsection 9a-2 provides the commissioner with authority to curtail the public's First Amendment rights in an unconstitutional manner that cannot be squared with the public interest.

In sum, the Court concludes that the Coalition has demonstrated a likelihood of success on the merits and a likelihood of irreparable harm if the Court fails to preliminarily enjoin the City and Commissioner Kruschke from enforcing subsection 9a-2 of the Special Event Ordinance as presently enacted. The Court also concludes that the balance of equities and public interest are served by an injunction. Accordingly, the Court will enter a preliminary injunction barring the enforcement of subsection 9a-2.[5]

## B. The Ordinance's Definition of "Parade" Is Not Unconstitutionally Vague or Overbroad.

The Coalition's final request for injunctive relief asks the Court to bar the City from enforcing its prohibition on "parades" within the preliminary security footprint on grounds that the Special Event Ordinance's definition of "parade" is unconstitutionally vague and overbroad. The Coalition argues that the definition is so vague and overbroad that it threatens prosecution of First Amendment rights and chills the Coalition's protected activities.

The void-for-vagueness doctrine holds that a law or ordinance violates Due Process when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *Williams*, 553 U.S. at 304). As stated above, the overbreadth doctrine allows for a facial challenge to a law or ordinance as violative of the First Amendment where it "prohibits a substantial amount of protected speech." *Ctr. for Individual Freedom*, 697 F.3d at 471 (quoting *Williams*, 553 U.S. at 292). But the overbreadth doctrine is to be employed "only as a last resort." *Id.* (quoting *Ferber*, 458 U.S. at 769).

---

[5] Of course, nothing in this Decision and Order or the resulting preliminary injunction should be understood to prevent law enforcement from arresting any protestors who actually engage in violent or destructive criminal conduct. Law enforcement personnel will be able to respond to actual criminal behavior if it occurs.

The Coalition offers two primary arguments on the merits of its challenge. First, it contends that the ordinance defines "parade" in a contradictory manner because, on the one hand, it limits all parades within the security footprint to the official parade route, while at the same time "a 'parade' by any reasonable definition is apparently permitted, in any size, so long as it is conducted on sidewalks and crosswalks and roads closed for pedestrians." (ECF No. 34 at 26.) This argument is without merit. For one, the Coalition makes no attempt to illuminate its understanding of "any reasonable definition" of a parade. More importantly, the ordinance does not rely on a reasonable or commonly understood definition of parade. To the contrary, subsection 2(i) explicitly defines a "parade" as "any formation, march, or procession of any kind traveling in unison for a common purpose upon the streets, excluding sidewalks, within the city *that interferes with the normal flow or regulation of vehicular or pedestrian traffic upon the streets within the city*." (ECF No. 76, § 2i (emphasis added).) Thus, under the ordinance, the distinction between a parade (which is subject to permitting and must be confined to the Official Parade Route) and unregulated pedestrian activity is interference with vehicular or pedestrian traffic. Nothing is vague or contradictory about that definition. Nor is it so standardless as to authorize or encourage seriously discriminatory enforcements.

The Coalition also argues that the ordinance's definition of parade can be broadly interpreted by prosecutors or law enforcement and thus violates Due Process. It is unclear from its briefing whether the Coalition intends this as an additional vagueness argument or a claim that the ordinance is unconstitutionally overbroad. It makes no difference. The ordinance provides clear instruction to both private citizens and public officials what activity is prohibited—interfering with the normal flow or regulation of vehicular or pedestrian traffic. As the City points out, this prohibition states only that citizens must obey state traffic laws. (ECF No. 24 at 23 (citing Wis. Stat. § 346.29(2) ("No person shall stand on any roadway . . . if such act interferes with the lawful movement of traffic.").) That can hardly be said to invite overbroad enforcement. And, as detailed extensively above, the ordinance's confinement of parades to the Official Parade Route at registered times is a constitutionally sound time, place, and manner restriction. Because the ordinance's definition of parade is not unconstitutionally vague and its restrictions on parades are constitutionally sound, the Coalition cannot show a likelihood of success on the merits. As Plaintiff's counsel conceded would be more appropriate at oral argument, an as-applied challenge may be brought in a separate suit if the ordinance is enforced in an unconstitutional manner.

The remaining preliminary injunction factors also caution against granting the Coalition injunctive relief. The Coalition has not established any likelihood that the ordinance's definition of parade will be enforced in an unconstitutional manner, thus any irreparable harm is purely speculative. And, as discussed above, the harm to the City would be considerable if it is left unable to enforce otherwise constitutionally valid restrictions on parades within the security footprint. The public interest is also implicated by the harm faced by the City if it is enjoined from enforcing its limitations on parades within the security footprint. The City's restrictions on the Coalition's and the public's First Amendment rights within the footprint are justified by concerns for public safety and traffic regulation. While upholding First Amendment rights is undoubtedly within the public interest as well, the danger here of infringement on those rights is minimal while the risks to public safety and orderly traffic regulation are great. Accordingly, the Court concludes that the Coalition is not entitled to a preliminary injunction enjoining the City from enforcing its limitations on parades within the security footprint as defined by the Special Event Ordinance.

## CONCLUSION

The Coalition members have the right to march in protest of the RNC. Their right to do so lies at the heart of the First Amendment. But the First Amendment does not allow them to protest or parade in any way they choose. The record demonstrates Defendants' extensive efforts to balance the Coalition members' right to express themselves against the legitimate security and other governmental interests that Defendants have been charged with defending. The vast majority of the resulting security plan is a reasonable and valid time, place, and manner regulation on speech. Accordingly, the Court will deny two of the Coalition's requests for injunctive relief. But Defendants overstepped their authority in reserving their ability to deny protest permits based on an applicant or his or her associate's prior criminal conviction and the Court will enjoin them from revoking parade or protest permits based solely on participants' or their associates' prior criminal convictions.

Accordingly,

**IT IS HEREBY ORDERED** that the Coalition's Motion for Preliminary Injunction, ECF No. 1 is **GRANTED in part** and **DENIED in** part. The City and Commissioner Kruschke are enjoined from denying or revoking permit registrations pursuant to subsection 9a-2 of the Special Event Ordinance based on an applicant or his or her associate's prior criminal conviction. The Coalition's other requested relief is denied. Consistent with Fed. R. Civ. P. 65(d)(1), a separate

order detailing the terms of the injunctive relief granted will be entered.  *See MillerCoors LLC v. Anheuser-Busch Cos., LLC.*, 940 F.3d 922 (7th Cir. 2019).[6]

Dated at Milwaukee, Wisconsin on July 8, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

---

[6] This relief is entered on a preliminary basis only.  As agreed at oral argument, if any party wishes to have further proceedings, they must notify the Court with a filing on the docket within 48 hours of the entry of this Decision and Order.  Absent such notice, the Court will treat this matter as having been advanced to a full trial on the merits under Fed. R. Civ. P. 65(a)(2) and a final judgment will be entered.